In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00046-CV


______________________________




CARSON ENERGY, INC. AND E. CARTER BILLS, II, Appellants



V.



RIVERWAY BANK, Appellee




 


On Appeal from the 189th Judicial District Court


Harris County, Texas


Trial Court No. 1999-11176




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Justice Carter



O P I N I O N



I. Nature of the Case

 This is an appeal from a summary judgment entered in favor of Riverway Bank on claims
filed by plaintiffs/appellants Carson Energy and E. Carter Bills, II, and the denial of the motion for
summary judgment filed by Carson Energy and E. Carter Bills. The dispute centers around a deposit
of funds at the Riverway Bank and the alleged breach of such depository agreement. The case before
us involves issues of (1) bailment special versus general deposit; (2) third-party beneficiary; and (3)
negligence. We affirm.

 A trial court must grant a motion for a conventional summary judgment if the moving party
establishes that no genuine issue of material fact exists and that the moving party is entitled to
judgment as a matter of law. Tex. R. Civ. P. 166a(c); Lear Siegler, Inc. v. Perez, 819 S.W.2d 470,
471 (Tex. 1991). A trial court properly grants summary judgment in favor of a defendant if the
defendant conclusively establishes all elements of an affirmative defense or conclusively negates at
least one element of the plaintiff's claim.  Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex.
1997). When reviewing a summary judgment, we take as true all evidence favorable to the
nonmovant and indulge every reasonable inference and resolve any doubts in favor of the
nonmovant. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985).

 In a no-evidence summary judgment, a party is entitled to a summary judgment if, after
adequate time for discovery, there is no evidence of one or more essential elements of a claim or
defense on which an adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i). 
Thus, a no-evidence summary judgment is similar to a directed verdict. Flameout Design &
Fabrication, Inc. v. Pennzoil Caspian, Inc., 994 S.W.2d 830, 834 (Tex. App.-Houston [1st Dist.]
1999, no pet.). The trial court must grant the motion unless the nonmovant produces more than a
scintilla of evidence raising a genuine issue of material fact on each of the challenged elements. 
Macias v. Fiesta Mart, Inc., 988 S.W.2d 316, 317 (Tex. App.-Houston [1st Dist.] 1999, no pet.). 
Under Rule 166a(i), the party with the burden of proof at trial has the same burden of proof in the
summary judgment proceeding. Galveston Newspapers, Inc. v. Norris, 981 S.W.2d 797, 799-00
(Tex. App.-Houston [1st Dist.] 1998, pet. denied). 

II. Facts

 E. Carter Bills (Bills) and Alan P. Bloxsom, III, are investors in oil and gas exploration. Over
the years, Bills' investments have been made by Carson Energy, Inc., and Bloxsom's through a
variety of entities. Bills and Bloxsom have owned working interests in several wells, and on several
of these wells, Bloxsom's entities have contracted to drill or rework wells, often on a turnkey basis. 
"Turnkey is just a way of limiting exposure." Essentially, the working-interest owner overpays a
specific amount into an account. When the terms of the turnkey agreement are sufficiently
performed, those funds are released to satisfy the terms of the turnkey agreement.

 Bloxsom's wife, Belinda Obst, was the president of Fort Apache Energy, Inc. Fort Apache
and other Bloxsom entities were customers of Riverway Bank (Riverway) for many years. 

 Both APB Oil Company and Fort Apache did business at Riverway, including prior instances
of accounts to hold the financial contributions of working-interest owners in wells that Bloxsom's
entities were drilling on a turnkey basis. Riverway and Riverway's officer that dealt with Bloxsom
understood what a turnkey drilling arrangement was. Prior accounts set up at Riverway to hold
interest owners' dry hole costs required dual signatures to release any such funds to ensure that
Bloxsom, as the turnkey driller, would complete his obligations before receiving payment of the dry
hole costs. Fort Apache had a separate corporate account at Riverway for its own, unrestricted funds. 

 Prior business endeavors requiring dual signature accounts at Riverway included the Smith
Point #1 project, the Powell Lumber #1 project, and the Bilbo Heirs #1 project. The Bilbo well was
set up under a turnkey agreement with Bills and Bloxsom. The Bilbo project occurred immediately
before the present dispute, and the required signatories to that deposit agreement were Bills and
Bloxsom. Bills' bookkeeper spoke with Riverway regarding the Bilbo account to ensure that it was
in fact a dual signature account requiring not only Bloxsom's signature, but also Bills', and that no
facsimile authorizations would be accepted. When Riverway received a letter with only Bloxsom's
signature requesting the transfer of some of the funds in the Bilbo account, Riverway required
Bloxsom to obtain Bills' signature before releasing the funds. The officer approving the transfer of
Bills' funds in the Bilbo account was James MacIntyre. 

 In September 1998, Bills and Bloxsom decided to rework the Stark Ethridge #1 well. Around
September 17, 1998, Carson Energy entered into a turnkey agreement with Fort Apache under which
Fort Apache was required to complete a turnkey rework of the Ethridge well, and on successful
completion of the rework, the working-interest owners (Bloxsom, Bills, and Carson Energy) would
authorize the release of the turnkey funds in the amount of $302,962.50 to Fort Apache. Bills' share
of the dry hole costs for rework of the well was $231,562.50, and Bloxsom's share was $71,300.

 Bills and Bloxsom agreed the dry hole costs would remain the property of Bills and Bloxsom
until the rework was completed pursuant to the turnkey agreement. In order to hold the dry hole
costs in an account where Bloxsom would not have access until the turnkey obligation was
completed, the parties established "Fort Apache Energy, Inc. Etheridge Turnkey Account" at
Riverway. The account required the signature of both Bloxsom and Bills to release funds. 
Riverway's representative would not allow Carson Energy's vice president, Daniel DeNefe, to be one
of the signatories on the turnkey account. Since Bills had been one of the two authorized signatories
on the Bilbo account, Bills was accepted as a signatory on the Ethridge account. Riverway did not
investigate Bills because he had previously been approved by Riverway on the Bilbo account. Bills
signed the deposit agreement used by Riverway after Bloxsom signed it, and then Bills sent it back
to Riverway. No written agreement between Bills and Bloxsom was presented to the bank.

 The deposit agreement in the present case is similar to the deposit agreement that Bills and
Bloxsom signed for the Bilbo account a few months earlier. The deposit agreements acknowledged
that Riverway had received valuable consideration from Bloxsom and Bills and had given
consideration to Bloxsom and Bills. It provided for the imposition of fees and charges by Riverway,
and Bloxsom's and Bills' signatures were both required for any transfer of funds out of the account. 
Bills did not have any communication with Riverway until after the funds were withdrawn.

 After the Ethridge deposit agreement was complete, Bills sent a check for his share of the dry
hole costs directly to Riverway. The check for the Ethridge deposit stated that the payee was the
"Fort Apache S.W. Starks-Escrow Account Ethridge Turnkey Account." Riverway accepted Bills'
check and deposited it into the account. Along with the addition of funds from Bloxsom, the account
balance's initial total on October 13, 1998, was $302,962.50. 

 In September 1998, Bloxsom began to rework the Ethridge well with his own funds so he
would be able to earn the release of the dry hole costs deposited in the account at Riverway. Before
reaching the point where he could "perforate the objective zone" set forth in the turnkey agreement,
Bloxsom ran into an unanticipated condition involving the well bore's casing that added significantly
to the cost of completing the turnkey objective. Bloxsom was not successful in reaching the turnkey
objective, but he nevertheless incurred significant debts with third parties. 

 Bloxsom faxed Riverway instructions on October 14, 1998, to transfer $21,300.00 of the
funds in the Ethridge account to Fort Apache's corporate account held by Riverway. This instruction
only contained Bloxsom's signature. The deposit agreement did not permit faxed instructions. The
funds were transferred to Fort Apache's corporate account maintained at Riverway. Bills did not
authorize Bloxsom's removal of these funds. Riverway admitted it failed to follow or consider the
dual signature requirement of the account and failed to follow its own policies in releasing this
money to Fort Apache's corporate account. The transfer request was initialed by MacIntyre,
Bloxsom's officer at Riverway since the 1980's; MacIntyre handled all of Bloxsom's business
relationships at Riverway, including the Bilbo account, where one week earlier, Bloxsom had tried
unsuccessfully to withdraw funds with his signature alone. 

 Bloxsom transferred an additional $221,662.50 out of the Ethridge account, using a faxed
withdrawal order with his signature and his wife's signature, Obst, on October 26, 1998. Bills did
not authorize the removal of these funds. On November 5, 1998, Bloxsom removed the remaining
$60,000.00 from the account. Bills did not authorize the removal of $60,000.00 from the account. 
Bills learned of Bloxsom's removal of the funds in January 1999. None of the withdrawals were
accomplished through any type of communication or documentation from Fort Apache. 

 After discovering Bloxsom's removal of the funds from the account, Bills' staff at Carson
Energy sought account records from Riverway. Riverway refused to disclose any records concerning
the account until Bills personally sent written authorization for release of account records. With
Bills' written authorization, Riverway disclosed the account records to Bills, without any signature
from Bloxsom or Fort Apache. 

 Bloxsom took $302,962.50 out of the account, $231,562.50 of which was Bills' money. Bills
sought to recover this amount from Riverway. Additionally in Bills' request for disclosure, he
itemized further damages relating to the work on the Ethridge well that had to be performed after he
discovered Bloxsom had removed the funds from the account. The items included $800,000.00 to
another oil company to rework the well, $60,000.00 paid to remove liens from the well, and
$75,000.00 in consulting fees. Riverway characterized all these damages sought by Bills as
economic losses caused by Riverway's admitted failure to comply with the deposit agreement. 

 On March 4, 1999, Bills filed suit against Riverway alleging (1) Riverway breached a
contract for bailment for the mutual benefit of the parties by failing to return Bills' funds tendered
to it for safekeeping; (2) Riverway breached the deposit agreement by releasing funds in the account
without the two required signatures authorize by the deposit agreement; and (3) Riverway was
negligent in releasing the funds in the account without requiring the two authorized signatures. 
Riverway answered by generally denying Bills' petition and pleading the affirmative defense of
Carson Energy's lack of capacity to sue, estoppel, laches, and failure of a condition precedent. Bills
moved for summary judgment on liability on all claims, and the trial court denied Bills' motion for
summary judgment. 

 Riverway filed a third-party action against Bloxsom individually, alleging he had deceived
Riverway in withdrawing funds from the account without both authorized signatures, fraudulently
misled Riverway in setting up the account, and for negligence. 

 The claims by Riverway against Bloxsom and Obst were later dismissed without prejudice. 
Bloxsom and Bills' claims against each other were dismissed. 

 The trial court granted Riverway's amended motion for summary judgment on all of Bills'
claims. In the summary judgment, the trial court found that plaintiffs' causes of action asserted
against Riverway for breach of bailment, breach of contract, and negligence arose from Riverway's
alleged failure to observe the dual signature requirement of a commercial demand deposit account
in which neither plaintiff possessed any ownership interest. The trial court further determined that 

 1) no privity of contract existed between plaintiffs and Riverway; 

 2) no competent summary judgment evidence indicated Riverway agreed to open the demand
deposit account for the benefit of either plaintiff, and 

 3) Riverway owed plaintiffs no duty to observe the signature requirements contained in the
deposit agreement establishing the demand deposit and ordered that plaintiffs take nothing. 

 Bills perfected this appeal on February 26, 2002, by filing a notice of appeal. 

III. Analysis

A. Bailment - General vs. Special Deposit

 When money is deposited in a bank without any special agreement, the law implies it is to
be mingled with the other funds of the bank. Martin v. First State Bank of Memphis, 490 S.W.2d
208, 211 (Tex. Civ. App.-Amarillo 1973, no writ). The relationship of debtor and creditor is created
between the bank and the depositor, and the deposit is recognized as a general deposit. Id. A
deposit made for some special application or disposition is a special deposit. Id. When a bank
knowingly accepts a deposit for a specific purpose, it cannot thereafter divert it for its own benefit
or otherwise act to defeat the purpose for which the deposit was made. Id. A special deposit, or one
made for a specific purpose differs from a general deposit in that title to the special deposit does not
pass to the bank, and the relationship created by the deposit is that of bailor and bailee, rather than
that of creditor and debtor. Id. 

 It is undisputed Riverway transferred funds out of the account without compliance with the
deposit agreement, which required the signatures of both Bloxsom and Bills. Texas law is settled
that, when a bank pays a check or validates a transfer of funds with less than the required number
of signatures, as the deposit agreement stipulates, this constitutes an "unauthorized signature." Tex.
Bus. & Com. Code Ann. § 1.201 (Vernon Supp. 2003) ("'Unauthorized' signature means one made
without actual, implied, or apparent authority and includes a forgery."); La Sara Grain Co. v. First
Nat'l Bank of Mercedes, 673 S.W.2d 558, 562 (Tex. 1984).

 Bills argues in his first point that the account created a bailment relationship and Riverway
violated the implied terms of the bailment. A bailor or bailee relationship exists between one who
deposits money into a bank and the bank if the account established is a special account or a special
deposit, as opposed to a general deposit account. Citizens Nat'l Bank of Dallas v. Hill, 505 S.W.2d
246, 248-49 (Tex. 1974). 

 Funds placed with the bank ordinarily become general deposits which create a debtor/creditor
relationship between bank and depositor. The burden is on the one who contends the bank is his or
her trustee or owes a duty to restrict the use of the funds for certain purposes. It must be shown the
bank agreed to that obligation. If the agreement of the bank is to be implied by its acceptance of a
deposit with the limitation stated on the deposit slip, the writing should set forth by clear direction
what the bank is required to do. Id. at 248. In Citizens, the plaintiffs' banks sent a credit note
advising the deposit was "for credit and advice Wayne Cook & Associates Trust Account by order
of Larry J. Hill for Skidmore Crook loan . . . ." Id. at 247-48. Another instruction was "[c]onfirming
telephone instructions for account of Wayne Cook and Associates Trust Account for loan to
Skidmore Crook Manufacturing Co. until sale . . . ." Id. at 248. The plaintiffs alleged the deposit
was a special account to be used only for the Skidmore Crook loan. The Texas Supreme Court held
that the wording of the credit memorandum did not direct that the bank control the disposition of
these funds and that it was a general deposit.

 Likewise, Pennzoil Company v. Southwest Bank of San Angelo, 775 S.W.2d 458 (Tex.
App.-Austin 1989, no writ), a special deposit was not found to exist even though the plaintiffs
accompanied their deposit to the defendant bank with a message from their bank among other things
stating "REF; BONUS CONSIDERATION ON 12 LEASES." Id. at 459. The court held this
writing failed to set forth by clear direction its intent that the funds were only to be disbursed as
bonus payments on certain leases. In the present case, no special instructions were presented to
Riverway.

 Bills argues in this case a special deposit was created, thereby establishing a bailor/bailee
relationship. He relies on the following:

 1. the signatures of Bloxsom and Bills were both required to withdraw funds, and funds
could not be withdrawn on facsimile authorization;

 2. prior custom and dealing of the parties;

 3. the deposit by Bills stated the payee was "Fort Apache Southwest Starks Escrow
Account Ethridge Turnkey Account."

 Riverway relies on the following to show the account is not a special deposit:

 1. the deposit account agreement was the only document evidencing the account; no
special instructions were contained in the account agreement;

 2. testimony of employee Deborah Rodriguez, who opened the account and testified
Bills never came to Riverway and she never spoke with him; she was not told the account was being
created to hold funds in trust, and she did not agree to do so;

 3. testimony of Bloxsom admitting he did not tell Riverway what the account was for; 
 4. Bills' testimony admitting he did not go to Riverway and did not speak to anyone
there until the funds had been withdrawn;

 5. testimony of MacIntyre, bank officer, who did not know there was anything particular
about the account; and that a trust or escrow account would require the approval of a bank officer
and a separate agreement between Riverway and the parties. 

 It is clear there were no other agreements or instructions given to Riverway other than that
found on the deposit agreement. We have found no authority, and none has been cited, holding that
an account requiring two signatures to release funds creates a special deposit.

 Bills alleges that evidence of a previous course of conduct or dealing assists in finding a
special deposit or bailment agreement. Trade usage or method of dealing evidence is admissible to
explain, supplement, or qualify an agreement, but it may not be used to contradict an express term;
it is also admissible to establish the meaning of an ambiguous contract. Transcon. Gas Pipeline
Corp. v. Texaco, Inc., 35 S.W.3d 658, 670 (Tex. App.-Houston [1st Dist.] 2000, pet. denied).

 The Bilbo account was the same type of account as the account presently at issue. Both
accounts served as funds for a turnkey agreement. Money was placed in the account, and Bills' and
Bloxsom's signatures were required to withdraw any funds. With the Bilbo account, the funds were
disbursed, according to the terms of the deposit agreement, only when both Bills and Bloxsom
signed. The terms of the Bilbo account were fully complied with, and the money was released
properly. However, the prior account does not further explain the nature of this account.

 There is also summary judgment evidence of a check deposited into this account signed by
E. Carter Bills drawn on the Starks Funding Account, payable to the order of Fort Apache S.W.
Starks Escrow Account for $231,562.50. This check was deposited into Riverway to the "Ethridge"
account, number 62075. This deposit was made two days after the account was established and
could not alter its nature. Further, a bank is not required to investigate memoranda on a check
describing the payment intended. See Frost Nat'l Bank v. Nicholas & Barrera, 534 S.W.2d 927,
933-34 (Tex. Civ. App.-Tyler 1976, writ ref'd n.r.e.).

 This Court finds that no genuine issue of material fact exists as to whether this was a special
deposit. It does not meet the test established by the Texas Supreme Court in Citizens National Bank
of Dallas v. Hill. Since there is no express special agreement, a special deposit can only be created
by implication. To do so, "the writing should set forth by clear direction what the bank is required
to do." 505 S.W.2d at 248. The point of error is overruled.

B. Third-Party Beneficiary

 Carson Energy and Bills argue that, even if they are not in direct privity with Riverway Bank
on the contract, they are third-party beneficiaries. Generally, only parties to a contract have the right
to complain of its breach. Temple Eastex, Inc. v. Old Orchard Creek Partners, Ltd., 848 S.W.2d
724, 730 (Tex. App.-Dallas 1992, writ denied). An exception exists when one who is not a party
to the contract shows that the contract was actually made for his or her benefit and that the
contracting parties intended that he or she benefit by it. Id. In such a case, that person becomes a
third-party beneficiary entitled to bring an action on the contract. Id. 

 There is a presumption against, not in favor of, third-party beneficiary agreements. MCI
Telecomm. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 652 (Tex. 1999); Young Ref. Corp. v.
Pennzoil Co., 46 S.W.3d 380 (Tex. App.-Houston [1st Dist.] 2001, pet. denied). Absent clear
indication in the contract that the parties intended to confer a direct benefit to the third party, the
third party may not maintain an action as a third-party beneficiary. MCI Telecomm. Corp., 995
S.W.2d at 651. A third party may recover on a contract made by other parties, only if the parties
intended to secure some benefit to that third party, and only if the parties entered into the contract
directly for the third party's benefit. Id.

 To qualify as one for whose benefit the contract was made, the third party must show he or
she is either a donee or creditor beneficiary of, and not one who is benefitted only incidentally by the
performance of, the contract. Id. One is a donee beneficiary if the performance promised will, when
rendered, come to him or her as a pure donation. Id. If, on the other hand, that performance will
come to him or her in satisfaction of a legal duty owed to him or her by the promisee, he or she is
a creditor beneficiary. Id. The duty to creditor beneficiaries may be an "indebtedness, contractual
obligation or other legally enforceable commitment" owed to the third party. Id. In determining
whether a third party can enforce a contract, the intention of the contracting parties is controlling. 
Id. The intention to contract or confer a direct benefit to a third party must be clearly and fully
spelled out or enforcement by the third party must be denied. Id. Consequently, a presumption
exists that parties contracted for themselves unless it "clearly appears" they intended a third party
to benefit from the contract. Id. 

 In determining whether a third party can enforce a contract, the intention of the contracting
parties is controlling. Id. A court will not create a third-party beneficiary contract by implication. 
Id. The intention to contract or confer a direct benefit to a third party must be clearly and fully
spelled out, or enforcement by the third party must be denied. Id. 

 In the case at bar, the contract or agreement has previously been described. It is a deposit
agreement wherein the depositor is Fort Apache Energy, Inc. Ethridge Turnkey Account. The only
reference to E. Carter Bills is that he is a signatory on the account. It further shows on the account
that the owner is a "corporation." Bills did not execute a signature in any representative capacity for
Carson Energy. There is no language in the deposit agreement indicating the account was being
opened for the benefit of Carson Energy or Bills. It does not specifically grant Bills a direct benefit. 
The agreement simply does not support a claim of third-party beneficiary for Bills or Carson Energy.

C. Negligence

 Appellants' next contention is Riverway was negligent in its handling of the account by
allowing Bloxsom to transfer funds without Bills' signature. Riverway has responded that Bills'
claim only arises by reason of the deposit agreement and is based on contract principles. It further
urges that all losses were economic and not recognizable in tort. Bills argues Riverway did not
present a motion for summary judgment regarding negligence. However, the pleading of Bills was
that the bank was negligent in releasing funds without proper authority. Bills did not plead any other
grounds of negligence. Riverway's motion for a summary judgment alleged it did not breach such
duty to Bills. 

 It is possible to have both contractual and tort remedies against the same party, if the injuries
so permit. Goose Creek Consol. Indep. Sch. Dist. v. Jarrar's Plumbing, Inc., 74 S.W.3d 486, 494
(Tex. App.-Texarkana 2002, pet. denied). 

 As a prerequisite to asserting a claim of negligence, there must be a violation of a duty
imposed by law independent of any contract. Southwestern Bell Tel. Co. v. DeLanney, 809 S.W.2d
493, 494 (Tex. 1991); Ortega v. City Nat'l Bank, No. 13-00-00064-CV, 2003 Tex. App. LEXIS 677,
at *27 (Tex. App.-Corpus Christi Jan. 23, 2003, no pet. h.). Where the only duty between parties
arises from a contract, a breach of this duty will ordinarily sound only in contract, not in tort. 
DeLanney, 809 S.W.2d at 494. 

 In Goose Creek, this Court held that entering a contract does not shield a party from regular
tort liability. The court found that a plumbing contractor owed a duty to all persons to use reasonable
care not to injure persons or property in the performance of the contract. The injury in that case
involved the invasion of sewage and sewer gas into the school buildings and the failure to use
reasonable care in installing the plumbing system. The court found that to be an independent tort
duty. See Goose Creek, 74 S.W.3d at 495. The court held that Goose Creek (as it was not a party
to the contract) could not raise a claim based solely on the duties imposed under the contract, but
could enforce the independent tort duty. See id. at 494.

 In this case, Carson Energy and Bills' cause of action for negligence alleges "the bank had
a duty to plaintiffs as well as to Fort Apache to safeguard the funds entrusted to them, and to not
release such funds except in accordance with the deposit agreement." Carson Energy and Bills have
asserted no independent duty owed to them other than that as established by the deposit agreement. 
The deposit contract alone is determinative of whether Riverway improperly released funds. As a
prerequisite to asserting a claim of negligence, there must be a violation of a duty imposed by law
independent of any contract. Delanney, 809 S.W.2d at 494; Ortega, 2003 Tex. App. LEXIS 677,
at *27. Having found no tort duty independent of the contract, the trial court correctly granted the
motion for summary judgment as to the negligence claim.

IV. Conclusion

 We affirm the judgment.



 Jack Carter

 Justice


Date Submitted: February 21, 2003

Date Decided: March 6, 2003