**Russell BURKE and Wife, Lori Burke, and Bob Anderson, as Chapter 7 Bankruptcy Trustee, Appellants**

v.

**UNION PACIFIC RESOURCES COMPANY, N/K/A Anadarko E & P Company, Palestine Water Well Service, Inc. and Jere Pritchett, Appellees.**

**Union Pacific Resources Company, N/K/A Anadarko E & P Company, Appellant**

v.

**Russell Burke and Wife, Lori Burke, and Bob Anderson, as Chapter 7 Bankruptcy Trustee, Palestine Water Well Service, Inc. and Jere Pritchett, Appellees.**

No. 06–02–00183–CV.

Court of Appeals of Texas, Texarkana.

Submitted March 31, 2004.

Decided April 16, 2004.

Opinion Overruling Rehearing June 9, 2004.

Ron Adkison Wellborn, Houston, et al., Henderson, and John R. Mercy, Mercy, Carter & Tidwell, LLP, Texarkana, TX, for Russell Burke & wife Lori Burke.

David M. Gunn, Beck, Redden & Secrest, LLP, Houston, Michael G. Carroll, Michael G. Carroll, PC, Tyler, for Union Pacific Resources Company (n/k/a Anadarko E & P Company).

Daniel F. Dean, Dean Coe & Associates, PC, Palestine, for Palestine Water Well Service, Inc. and Jere Pritchett.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

In the fall of 1997, Union Pacific Resources Company (UPRC) conducted a seismic survey consisting of most of Rusk County. After the survey had been con-

ducted, Russell and Lori Burke noticed their recently drilled water well was producing an excessive amount of sand. The sand caused decreased weight gain on their feedlot cattle and caused over 1,000 of the cattle to die. After they were forced into bankruptcy, Russell and Lori Burke and Bob Anderson, the bankruptcy trustee (herein collectively "the Burkes"), sued UPRC and Palestine Water Well Service, Inc. (PWW). After a jury trial, the trial court rendered judgment against UPRC, awarding the Burkes $1.5 million and awarding PWW $200,000.00. The Burkes appeal the judgment of the trial court, and UPRC cross-appeals. We render a take-nothing judgment concerning PWW's tortious interference claim and suggest a remittitur concerning the Burkes' breach of contract claim.

The Burkes raise the following three issues on appeal:

1) Where the evidence shows that the water well was eventually repaired and some water service restored, was it error for the jury to find that the injury to the Burkes was permanent?

2) Where the expert only discovered that the seismic blasting damaged the well in December 2001, was it error for the jury to find that the Burkes should have discovered it on January 1, 1998?

3) Where there was uncontroverted evidence concerning attorney's fees, was it error for the jury to find that the Burkes were not entitled to recover attorney's fees?

Union Pacific Resources Company, n/k/a Anadarko E & P Company, presents eleven issues on appeal. UPRC's issues are as follows:

1) Did the Burkes prove their right to recover from UPRC on a breach of contract theory based on the testing permit (PX–17)?

2) Did the Burkes prove their right to recover from UPRC as purported third-party beneficiaries of the indemnity contract (PX–99) between UPRC and Schlumberger?

3) Is there an adequate pleading by the Burkes to support recovery of consequential damages?

4) Is there sufficient evidence of the Burkes' direct damages?

5) Is there sufficient evidence to support a total damage award of $1.5 million?

6) Is UPRC entitled to a credit for the Schlumberger settlement?

7) Does the two-year statute of limitations bar PWW's claims for tortious interference?

8) Does the lack of a pleading prevent PWW from recovering for tortious interference with prospective relations?

9) Is there sufficient evidence to support either of PWW's claims for tortious interference?

10) May PWW recover attorney's fees or expert witness fees as tort damages?

11) Is there sufficient evidence of malice by UPRC toward PWW?

### Facts

In the fall of 1997, the Burkes decided to open their own feedlot cattle preconditioning operation. Russell Burke was familiar with the business, having worked with his father for many years in a similar operation. Dr. Christopher Grotegut testified that he was familiar with Russell Burke and his father and that they had been in the business a long time. The Burkes purchased ninety-four acres in Laneville, Texas, and began to develop a preconditioning feedlot operation.

Most cattle ranchers in this region of Texas have small operations. Due to their

small size, it is not always profitable to precondition calves. A feedlot cattle preconditioning operation obtains calves from numerous operations and provides vaccinations and other care in a low stress environment until the calves' immune systems are strong enough to fight diseases and stress on their own. It is essential to a preconditioning operation that quality water be made available to nurture the calves. Poor hydration will cause the cattle to have decreased appetites and result in reduced weight gain. Proper hydration will decrease the frequency and effect of diseases. Poor hydration will, however, prevent drugs from treating diseases as well as they should. The Burkes' operation involved cattle that they owned outright, cattle that they partnered with others, and cattle that they fed for customers.

In order to obtain an adequate water supply, the Burkes contracted with PWW to drill a water irrigation well. PWW and the Burkes selected a location for the well based on PWW's knowledge of the Laneville area and its sand formations. PWW started drilling the well on November 17, 1997, and completed the well on November 21, 1997. While PWW was in the process of drilling the well, it noticed some seismic testing operations approaching the area.

On September 22, 1997, the Burkes gave permission for seismic testing of their ninety-four acres. Seismic testing is a method of exploring for hydrocarbons under the ground. Schlumberger Technology Corporation (Schlumberger) performed the seismic testing on behalf of UPRC, which involved thirty-six square miles and lasted several months. Seismic testing involves drilling a shot hole, placing charges in the hole, and collecting readings of the waves created by the detonation of the explosives.

Due to his previous oil field experience, Jere Pritchett, an employee of PWW, be-came concerned about the effect of the seismic testing on the well. Pritchett stopped the drilling of the well and informed the seismic crew about the well. Some of the seismic crew came to the well site and discussed the situation with Pritchett. The Burkes did not want to stop drilling the well because they had to get the feedlot operating in order to make payments on their obligations. Schlumberger agreed to move their explosive charges away from the well so as not to damage it.

Schlumberger obtained an agreement from UPRC to pay for any damage to the well caused by the seismic testing. Bennie Bates, the field project manager, signed the agreement on behalf of UPRC. John Gibson, the project manager, testified he authorized Bates to execute the agreement.

When PWW finished the well, it produced clean water without any sand. The Burkes did not install a pump until January 1998. After the well had been drilled, but before the pump was installed, Schlumberger performed the blasting. After the blasting, the Burkes and Pritchett noticed the well pad had been "uplifted" three to four inches above the ground. When the pump was activated, there was sand in the water. The well eventually began producing parts of the gravel pack intended to filter out the sand. This indicated that the gravel pack and screen had been broken. The sand production became so bad that the 900–gallon holding tank and automatic watering troughs would fill with sand. Sometimes the watering troughs needed to be cleaned out fifteen to twenty times a day. The Burkes installed two sand separators in an attempt to filter out the sand. Initially, Burke and PWW were unable to determine the cause of the problem.

Eventually, the parties discovered that the seismic crews had detonated charges closer to the well than discussed earlier and had increased the magnitude of the charges. Three of the charges had been detonated in violation of the safe distance guidelines that UPRC had developed for another project.

The cattle being raised by the Burkes had abnormally high rates of pneumonia and mortality. The cattle gained less weight than expected. Further, out of the first 500 cattle brought to the operation, approximately 125 died. The Burkes brought in an expert to evaluate the operation, who determined the only major problem with the operation was the sand in the water. The Burkes repaired the well by having Travis Russell place a patch on the gravel pack. However, the repaired well only produced approximately one half its original volume. On December 4, 2001, it was discovered that UPRC had moved the holes closer to the well rather than farther away from it.

Out of the 14,000 cattle which had been conditioned by the operation, approximately 1,300 died. On average, a feedlot will have two percent of the calves die from natural causes. Dr. Grotegut testified the Burkes' excessive losses were tied directly to the water problems. In an attempt to maintain good relations with their customers, the Burkes replaced 500 of the cattle with their own money. The Burkes sold their home and borrowed additional money for the replacements. Of the cattle that survived, the Burkes had higher medical expenses and feed costs. The cattle ended up with a weight gain of only 1.5 pounds per day, rather than the 2.5 pounds which the Burkes had expected. Because the income from the feedlot was based on weight gain, the Burkes lost approximately $25.00 per head on the surviving cattle.

Eventually, the Burkes declared bankruptcy. On December 29, 1999, the Burkes and the bankruptcy trustee sued PWW for negligence, violations of the Texas Deceptive Trade Practices Consumer Protection Act (DTPA), gross negligence, breach of contract, breach of implied warranties, and violations of 16 Tex. Admin. Code Ann. § 76.705(a) (2003). On January 12, 2000, the Burkes joined UPRC and Schlumberger, alleging negligence, gross negligence, breach of contract, breach of implied warranty of merchantability, breach of implied warranty of fitness, and DTPA violations. Schlumberger settled with the Burkes for $125,000.00. PWW filed a cross-action against UPRC for tortious interference with an existing contract based on its conduct in blasting within alleged unsafe distances of the well.

The jury found for the Burkes on the contract, third-party beneficiary, and negligence theories. However, the jury found the Burkes were on notice of the damage to the well on January 1, 1998. The jury found that the Burkes had actual damages of $1.5 million and awarded $3 million in punitive damages on the tort theory. The jury found PWW did not breach its contract with the Burkes and awarded PWW $100,000.00 in actual damages and $100,000.00 in punitive damages for its tortious interference with contractual relations suit against UPRC. The trial court rendered judgment awarding the Burkes the $1.5 million and awarded PWW $200,000.00. Apparently, as a result of the jury's finding on the issue that governed the date of the statute of limitations, the court denied them all relief on the Burkes' tort theory, including the $3 million punitive award.

### Summary

We first determine whether the statute of limitations bars the Burkes' negligence

claim. We conclude that it does, since there is sufficient evidence to support the jury's findings that the injury was permanent and that the discovery date of the injury should have been January 1, 1998. Next, we address the sufficiency of the evidence of the Burkes' attorney's fees. Because error is not preserved, we overrule this point of error. Then we determine whether the contract between the Burkes and UPRC concerns activities which did not occur on the Burkes' land. We conclude that the objective intent of the parties indicates the contract warranties cover those activities normally defined as "seismic testing," which includes the generation of waves on a neighbor's property. We then address whether the jury's award of $1.5 million is against the great weight and preponderance of the evidence and whether UPRC was entitled to a settlement credit. We conclude the jury verdict is against the great weight and preponderance of the evidence, and we suggest a remittitur. UPRC is entitled to a settlement credit. The last issue concerns whether PWW's tortious interference claim is barred by the statute of limitations. Because there is sufficient evidence to support the jury's conclusion, we hold that PWW's tortious interference claim is barred.

### Standards of Review

The evidence is legally insufficient when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 77 S.W.3d 253, 262 (Tex.2002). When deciding a no-evidence point, in determining whether there is no evidence of probative force to support a jury's finding, we must consider all of the evidence in the record in the light most favorable to the party in whose favor the verdict has been rendered, and we must apply every reasonable inference that could be made from the evidence in that party's favor. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997).

If we find some probative evidence, we will test the factual sufficiency of that evidence by examining the entire record to determine whether the finding is clearly wrong and unjust. When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). A court of appeals may set aside the verdict only if it is so contrary to the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. *Id.; Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The court of appeals is not a fact-finder. Accordingly, the court of appeals may not pass on the witnesses' credibility or substitute its judgment for that of the fact-finder, even if the evidence would clearly support a different result. *Ellis,* 971 S.W.2d at 407. We do not pass on the credibility of the witnesses, and we do not substitute our opinion for the trier of fact, even if there is conflicting evidence on which a different conclusion could be supported. *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

### Permanent Injury

█ In their first point of error, the Burkes argue that the evidence is factually and legally insufficient to support the jury's finding that the injury to the water well was permanent in nature. The Burkes contend that temporary injuries are not restricted to only injuries caused by wind or rain and that the injury was clearly temporary because it could be repaired.

█ UPRC responds that whether the injury is temporary or permanent is irrelevant because the injury is not a continuing tort. The general rule in torts is that a cause of action accrues when the wrongful act causes an injury. *Dickson Constr., Inc. v. Fid. & Deposit Co. of Md.,* 960 S.W.2d 845, 851 (Tex.App.-Texarkana 1997, no pet.). One exception to the general rule is a continuing tort. *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.,* 53 S.W.3d 799, 812 (Tex.App.-Austin 2001, pet. denied); *First Gen. Realty Corp. v. Maryland Cas. Co.,* 981 S.W.2d 495, 501 (Tex. App.-Austin 1998, pet. denied); *Dickson Constr., Inc.,* 960 S.W.2d at 851. A cause of action for a continuing tort does not accrue until the defendant's tortious act ceases. *First Gen. Realty,* 981 S.W.2d at 501.

█ UPRC argues that the determination of whether the injury was temporary or permanent is irrelevant because the tortious conduct was not repeated over time. A continuing tort occurs when tortious conduct is repeated over time. *Jim Arnold Corp. v. Bishop,* 928 S.W.2d 761, 766 (Tex.App.-Beaumont 1996, no pet.). Because the only tortious conduct committed by UPRC occurred over two years ago, UPRC argues there is no continuing tort since the accumulation of damages does not prevent the accrual of the cause of action. *See First Gen. Realty,* 981 S.W.2d at 501; *cf. Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex.1990).

However, only one of the cases cited by UPRC deals with injury to property. In *First General Realty,* the Austin Court of Appeals applied this principle from cases not involving damage to property.[1] *First General Realty,* though, did not involve tortious conduct which caused damage to property, but rather the failure to disclose that the property had a tendency to flood, which caused damage to the property. *First Gen. Realty,* 981 S.W.2d at 501–02.

█ UPRC's argument fails because a finding of a continuing tort is not the only method to postpone the accrual of the cause of action. Further, several courts of appeals have held the doctrine of continuing torts does not apply to injury to property. The Fort Worth Court of Appeals has held that the continuing tort doctrine does not apply to claims arising from permanent injury to land. *Mitchell Energy Corp. v. Bartlett,* 958 S.W.2d 430, 443 (Tex. App.-Fort Worth 1997, pet. denied); *Hues v. Warren Petroleum Co.,* 814 S.W.2d 526, 529 (Tex.App.-Houston [14th Dist.] 1991, writ denied) ("continuing threat" barred by statute). The El Paso and Houston courts have agreed that the doctrine of continuing torts does not apply to injury to property. *Walton v. Phillips Petroleum Co.,* 65 S.W.3d 262, 273 (Tex.App.-El Paso 2001, pet. denied); *Loyd v. ECO Res., Inc.,*

---

1. *See Two Pesos, Inc. v. Gulf Ins. Co.,* 901 S.W.2d 495, 500 (Tex.App.-Houston [14th Dist.] 1995, no writ) (trade dress infringement is a continuing tort); *Arquette v. Hancock,* 656 S.W.2d 627, 629 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.) (refusal to refund a fine after the conviction had been reversed on appeal not a continuing tort); *Adler v. Beverly Hills Hosp.,* 594 S.W.2d 153, 156 (Tex.Civ.App.-Dallas 1980, no writ) (unlawful detention).

956 S.W.2d 110, 127 (Tex.App.-Houston [14th Dist.] 1997, no pet.).

 The determination of the accrual date for damage to property depends on the characterization of the injury as permanent or temporary.

> Permanent injuries to land give rise to a cause of action for permanent damages, which are normally measured as the difference in the value of the property before and after the injury. Temporary injuries give rise to temporary damages, which are the amount of damages that accrued during the continuance of the injury covered by the period for which the action is brought.

*Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984). While a cause of action for a permanent injury to land must be brought within two years, damages for temporary injuries may be recovered for the two years before filing suit. *Id.* There are two major characteristics which courts examine when determining whether an injury is permanent or temporary. The nature of the injury depends on either the "continuum" of the injury and whether an injunction would abate the injury.

The first characteristic is the continuum of the injury. In *Bayouth,* the Texas Supreme Court held that:

> The character of an injury as either permanent or temporary is determined by its continuum. Permanent injuries to land result from an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely; the injury must be constant and continuous, not occasional, intermittent or recurrent. Temporary injuries, however, have been found where the injury is not continuous, but is sporadic and contingent upon some irregular force such as rain. *Kraft v. Langford,* 565 S.W.2d 223 (Tex.1978); *Atlas Chemical Industries, Inc. v.*

*Anderson, supra* [524 S.W.2d 681] at 685 [ (Tex.1975) ].

*Bayouth,* 671 S.W.2d at 868–69.

 The second characteristic is whether an injunction would abate the injury. The Texas Supreme Court has recognized that the ability to enjoin successfully the activity or condition causing the damage indicates that the injury could be temporary. *Neely v. Cmty. Prop., Inc.,* 639 S.W.2d 452, 454 (Tex.1982); *Kraft v. Langford,* 565 S.W.2d 223 (Tex.1978); *see Bates v. Schneider Nat'l Carriers, Inc.,* 95 S.W.3d 309, 314 (Tex.App.-Houston [1st Dist.] 2002, pet. granted); *Nugent v. Pilgrim's Pride Corp.,* 30 S.W.3d 562, 567 (Tex.App.-Texarkana 2000, pet. denied). The Burkes argue that, because the well can be repaired, the injury is temporary. They do not argue that an injunction would solve the problem, but rather that the problem can be abated. The Tenth Circuit has observed that, if an injury is abatable or remediable, courts generally characterize it as temporary. *Miller v. Cudahy,* 858 F.2d 1449, 1454 (10th Cir. 1988) (recognizing the confused state of the law). At least one Texas case appears to support that, if an injury can be abated, it is temporary. In *Crown Central Petroleum Corp. v. Coastal Transport Co.,* the Fourteenth Court of Appeals held that injury to a loading facility was temporary because the facility could be rebuilt. *Crown Cent. Petroleum Corp. v. Coastal Transport Co.,* 38 S.W.3d 180 (Tex.App.-Houston [14th Dist.] 2001, pets. granted) (loading facility burned after the engine running on one truck ignited gasoline vapors that spilled from a second truck). While the ability to abate an injury with an injunction is a characteristic of a temporary injury, the unavailability of an injunction does not require a finding of a permanent injury. *City of Odessa v. Bell,* 787

S.W.2d 525, 530 (Tex.App.-El Paso 1990, no writ).

■■■ Sufficient evidence exists to support the jury's conclusions. The question of whether injury to property is permanent or temporary is a question of fact for the jury. *Trinity & S. Ry. Co. v. Schofield*, 72 Tex. 496, 10 S.W. 575, 577 (1889); *Hood v. Adams*, 334 S.W.2d 206, 208 (Tex. Civ.App.-Amarillo 1960, no writ); *see Bayouth*, 671 S.W.2d at 868. Under the continuum test, there is ample evidence to support a finding of permanent injury. The blasting, a one-time event, caused the damage to the well. The damage, although increasing over time, did not occur sporadically or irregularly. The evidence at trial established that the sand was constantly present in the water. The only evidence of irregular forces involved the greater demand for water during hot weather. Thus, the finding of a permanent injury is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.

### Discovery Date of the Burkes' Injury

The Burkes contend the jury's finding that they knew or should have known of the injury on January 1, 1998, is against the great weight and preponderance of the evidence. Because the parties did not confirm the cause of the injury until they discovered the location of the shot holes on December 4, 2001, the Burkes argue that the jury's conclusion is factually insufficient.

■■■ UPRC's first counter-argument is that the error was not preserved. UPRC argues that the Burkes' failure to file a motion for new trial resulted in the

error, if any, not being preserved. A factual sufficiency point of error must be preserved with a motion for new trial. TEX.R. CIV. P. 324(b). However, the Burkes did file a pleading entitled "Motion for Judgment and Judgment Notwithstanding the Verdict." In this motion, the Burkes argued that the jury's finding on this issue was against the great weight and preponderance of the evidence and requested "all relief consistent with this motion." A motion should be construed by its substance to determine the relief sought, not merely by its form or caption. *See Surgitek, Bristol–Myers Corp. v. Abel*, 997 S.W.2d 598, 601 (Tex.1999). Based on its substance, the motion preserved error by arguing that the jury's finding was against the great weight and preponderance of the evidence.

■■■ UPRC argues that the discovery rule should not apply because the injury is not inherently undiscoverable and objectively verifiable. However, none of the cases cited by UPRC deal with injury to property.[2] In actions for damage to property, Texas courts have consistently applied the discovery rule. *Bayouth*, 671 S.W.2d at 868; *Hues*, 814 S.W.2d at 529; *cf. W.W. Laubach Trust/Georgetown Corp. v. Georgetown Corp./W.W. Laubach Trust*, 80 S.W.3d 149, 159 (Tex.App.-Austin 2002, pet. denied). The discovery rule, when it applies, tolls the running of limitations and is an exception to the legal injury rule. *See S.V. v. R.V.*, 933 S.W.2d 1, 14 (Tex.1996). UPRC's argument fails because the discovery rule has clearly been applied to cases involving injury to property.

■■■ The Burkes contend that the cause of action does not arise until the

---

**2.** *See Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 454 (Tex.1996) (trade secrets); *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 612 (Tex.App.-Texarkana 2002, pet. denied) (oil and gas lease); *Schindley v. Northeast Tex. Comm. Coll.*, 13 S.W.3d 62, 67 (Tex.App.-Texarkana 2000, pet. denied) (employment termination).

cause of the injury is discovered. However, this argument fails because the cause of action accrues on discovery of the injury. "An action for permanent damages to land accrues, for limitation purposes, upon discovery of the first actionable injury and not on the date when the extent of the damages to the land are fully ascertainable." *Bayouth*, 671 S.W.2d at 868; *Nugent*, 30 S.W.3d at 567–68.

Several Texas courts of appeals have specifically rejected the contention that the cause of action does not accrue until the cause of the injury to the property is discovered.[3] The Tyler Court of Appeals differentiated the discovery rule applicable in medical malpractice cases in rejecting the argument that the cause of action fails to accrue until discovery of the cause of the injury to the property. *See Yancy v. City of Tyler*, 836 S.W.2d 337, 339 (Tex.App.-Tyler 1992, writ denied). In *Bartlett*, the Fort Worth Court of Appeals held that the trial court erred in instructing the jury that injury is not discovered until the plaintiff knows or should have known the cause of the injury to the property. *Bartlett*, 958 S.W.2d at 437. Citing the *Bartlett* decision, the El Paso court held similarly in dicta. *Walton*, 65 S.W.3d at 271. Absent a compelling reason to decide otherwise, we will follow our sister courts' reasoning.

 The jury's finding of January 1, 1998, as the discovery date of the injury is not so contrary to the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. The cause of action for injury to property accrues when the injury is discovered. UPRC argues that the evidence establishes the pump was installed on December 16, 1997. During trial, Pritchett testified the pump was installed after "some time lapse," which would have been around January 1998. However, on cross-examination, UPRC pointed out Pritchett had previously testified by deposition that he had installed the pump on December 16, 1997. Lori Burke testified they discovered sand in the well when the pump was installed around the "First of January." There is some evidence that the Burkes suspected the blasting may have been the cause of the injury at this time. Pritchett had filed an affidavit earlier in the case in which he stated that Russell Burke accused the seismograph survey of "tearing up" the well when the pump was installed. The finding of January 1, 1998, is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. Since the discovery date is factually sufficient, we will not address UPRC's remaining counter-arguments concerning the negligence claim. Because the Burkes' negligence claim was filed against UPRC more than two years after the accrual of that cause of action, it is barred by the statute of limitations. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.003 (Vernon 2002).

---

3. *See Walton v. Phillips Petroleum Co.*, 65 S.W.3d 262, 272–73 (Tex.App.-El Paso 2001, pet. denied); *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 437 (Tex.App.-Fort Worth 1997, pet. denied); *Yancy v. City of Tyler*, 836 S.W.2d 337, 339 (Tex.App.-Tyler 1992, writ denied). We note that the Texas Supreme Court has held that a party is not required to sue until the injury is objectively verified to be the result of wrongful conduct of a tortfeasor in the context of latent diseases. *Childs v. Haussecker*, 974 S.W.2d 31, 43 (Tex.1998); *see Youngblood v. United States Silica Co.*, 130 S.W.3d 461 (Tex.App.-Texarkana 2004, no pet.). The Texas Supreme Court specifically referred to this rule as the "latent disease discovery rule." *Childs*, 974 S.W.2d at 44. The Texas Supreme Court reasoned it is unsound policy to require a suit to be filed on mere suspicion. This rule appears to be restricted to latent diseases. *See Yancy*, 836 S.W.2d at 339.

### The Burkes' Attorney's Fees

The Burkes argue that the award of zero dollars in attorney's fees is against the great weight and preponderance of the evidence. UPRC argues the Burkes failed to preserve error, if any. No motion for new trial was filed concerning the issue of attorney's fees. A motion for new trial must be filed in order to preserve a factual sufficiency review. Tex.R. Civ. P. 324(b). The Burkes have failed to preserve error concerning the issue of attorney's fees.

### Breach of Contract Theory

In its first point of error, UPRC argues that the Burkes do not have a cause of action for breach of contract. UPRC argues that the agreement only contains two promises by UPRC to the Burkes. According to UPRC, the contract only requires it to pay ten dollars per acre for surface access to conduct the operation and to pay for claims or damages arising from any testing done on the Burkes' own land. The dispute concerning the contract issue revolves around whether the contract term "seismic testing" is limited to testing done on the Burkes' land or whether it includes UPRC's actions in conducting the survey, which included the Burkes' land. We conclude that the contract includes more than merely surface activity.

UPRC argues that there is no evidence that any seismic work on the Burkes' land affected or even approached the water well. Instead, the focus of the trial was on a line of shot holes across the road on a neighbor's property. These holes were just across the property line and relatively close to the Burkes' water well. UPRC contends these activities are not covered by the contract because they were not conducted on the Burkes' land.

In response to Question 1, the jury found UPRC failed to comply with the agreement with the Burkes. Question Number 1 asked:

Did Union Pacific Resources Company fail to comply with the agreement dated September 22, 1997 between itself and the Burkes?

Answer "Yes" or "No".

Answer: Yes

The agreement in question, which UPRC refers to as the "testing agreement," provides specifically:

We respectfully request permission to conduct a Seismograph survey across surface and or mineral property(s) owned and/or leased by you as defined according to the following legal description;

. . . .

Our operations will be conducted in accordance with standard Geophysical practices and in a prudent and careful manner, and we agree to hold you free and harmless from any and all claims and damages that may result from our work by virtue of your permission herein granted, including all land owned or claimed by lessor adjacent or contiguous to the land particularly described above, whether the same be in said survey or surveys or in adjacent surveys although not included within the boundaries of the land particularly described above.

When interpreting contracts, the primary concern of this Court is to give effect to the parties' intentions as expressed in the contract. *CMS Partners, Ltd. v. Plumrose USA, Inc.*, 101 S.W.3d 730, 732 (Tex.App.-Texarkana 2003, no pet.). In determining the parties' intentions, intent must be taken from the agreement itself, not from the parties' present interpretation. *Id.* The agreement will be enforced as created regardless of whether the parties contracted wisely. *Id.*

UPRC urges this Court to adopt a construction of this agreement which would only produce liability for the testing actually done on the Burkes' land. Under this construction, the contract exposes UPRC to liability only for damage caused by testing done on the Burkes' land, not for testing done on a neighbor's land. UPRC contends the contract is limited to work being done "by virtue of your permission herein granted." The "hold harmless" clause includes the clarification "including all land owned or claimed by lessor...." Further, the clause refers to "property described hereinabove," i.e., the Burkes' ninety-four-acre tract. While the "hold harmless" clause refers only to operations occurring on the Burkes' land, we disagree that the objective intent of the entire agreement does not apply to work done on someone else's land.

The contract, as a whole, is not limited to surface activities on the Burkes' land. The contract includes UPRC's actions in conducting the survey, which involves the Burkes' land. The contract is a form contract clearly developed for both mineral and surface owners. There are several blanks and boxes intended to designate whether permission is being obtained from a surface owner or a mineral owner. Although the "hold harmless" clause may be limited to the Burkes' land, it is only one clause in the contract. The objective intent of the parties was to require that the seismic testing be conducted in a safe and prudent manner. This interpretation is reasonable because there are many reasons UPRC would seek permission to conduct the seismic survey and would be willing to make this promise to obtain the said permission.

■ UPRC's argument fails because the objective intent of the standard practices clause is not confined to activities on the Burkes' land. The contract as a whole applies to the survey, rather than activities on the Burkes' land. The permit, the contract at issue, involves granting of permission by the Burkes to UPRC to conduct a "seismic survey" across the Burkes' land. Courts should give terms their plain, ordinary, and generally accepted meaning unless the contract indicates otherwise. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). Technical words and terms in a contract are to be construed by the courts as those terms are usually understood by persons in the profession or business to which the terms relate, unless it is clear that the terms were used in a different sense. *Oil Ins. Ass'n v. Royal Indem. Co.,* 519 S.W.2d 148, 150 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.); *Frost v. Martin,* 203 S.W. 72, 74 (Tex.Civ.App.-Fort Worth 1918, no writ). The United States Department of Agriculture pamphlet on geophysical operations, which was introduced into evidence, defines seismic testing as a method of exploring for hydrocarbons under the ground. Seismic testing relies on the mathematical analysis of various echoes or reflective waves that are generated when an explosive charge is detonated at the bottom of a deep hole. Thus, seismic testing involves more than mere surface activity. It involves surface activities such as detonation of explosives and the drilling of holes, as well as the waves generated by the explosions and the analysis of these waves. We conclude that the phrase "seismic testing" in the contract includes generating reflective underground waves.

■ The Burkes argued on appeal and at trial that UPRC is liable because it did not conform to the "standard Geophysical practices" or conduct the blasting "in a prudent and careful manner." Although the standard practices clause is in the same sentence as the hold harmless clause,

they are contained in independent clauses. An independent clause can stand alone as a sentence. WILLIAM STRUNK, JR. & E.B. WHITE, THE ELEMENTS OF STYLE, p. 5 (4th ed.2000). The qualifying language that may limit the hold harmless clause to activities on the Burkes' land does not apply to the standard practices clause. Therefore, the standard practices clause applies to the "seismic survey," which includes subsurface activities such as the generation and measurement of the waves.

■ The standard practices clause creates an express warranty guaranteeing that UPRC's actions and the actions of its agents will be "conducted in accordance with standard Geophysical practices and in a prudent and careful manner." The Burkes presented ample evidence that UPRC's activities were not conducted in a "prudent and careful manner" and some evidence that they were not conducted in accordance with "standard Geophysical practices." Therefore, the Burkes did have a cause of action for breach of the contract.

### Third–Party Beneficiary Theory

■ At the end of trial, the Burkes requested a trial amendment to add a cause of action based on being a third-party beneficiary to a contract between UPRC and Schlumberger's Geco–Prakla division. The Burkes argue they are third-party beneficiaries because the contract clearly intends to secure payment of damages to the Burkes' well. UPRC responds the agreement is merely an indemnity agreement between it and Schlumberger.

■ There is a presumption against, not in favor of, third-party beneficiary agreements. *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999); *Carson Energy, Inc. v. Riverway Bank*, 100 S.W.3d 591, 600 (Tex.App.-

Texarkana 2003, pet. denied). Absent clear indication in the contract that the parties intended to confer a direct benefit to the third party, the third party may not maintain an action as a third-party beneficiary. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600; *Hurley v. Lano Int'l, Inc.*, 569 S.W.2d 602, 603 (Tex.Civ.App.-Texarkana 1978, writ ref'd n.r.e.). A third party may recover on a contract made by other parties only if the parties intended to secure some benefit to that third party and only if the parties entered into the contract directly for the third party's benefit. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600; *Hurley*, 569 S.W.2d at 603.

■ To qualify as one for whose benefit the contract was made, the third party must show he or she is either a donee or creditor beneficiary of the contract, i.e., not one who is benefitted only incidentally. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600; *Hurley*, 569 S.W.2d at 603. One is a donee beneficiary if the performance promised will, when rendered, come to him or her as a pure donation. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600. If, on the other hand, that performance will come to him or her in satisfaction of a legal duty owed to him or her by the promisee, he or she is a creditor beneficiary. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600. The duty to creditor beneficiaries may be an "indebtedness, contractual obligation or other legally enforceable commitment" owed to the third party. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600; *Hurley*, 569 S.W.2d at 603. In determining whether a third party can enforce a contract, the intention of the contracting parties is con-

trolling. A court will not create a third-party beneficiary contract by implication. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600. The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out, or enforcement by the third party must be denied. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600; *Hurley*, 569 S.W.2d at 603. Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" they intended a third party to benefit from the contract. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Carson Energy, Inc.*, 100 S.W.3d at 600; *Hurley*, 569 S.W.2d at 603.

█ In the case at bar, the contract was formed between Schlumberger's Geco–Prakla division and UPRC. The Burkes do not argue they were a party to the contract. The contract provides:

> U.P.R.C. has agreed to the following distances and charge sizes in the vicinity of a new water well that was drilled after the shot points were drilled. This water well is situated on the North side of highway 1798 and between receiver lines 412 and 424. This well was drilled to service a new cattle feedlot. It was drilled to a depth of 600′ and cased with PVC casing. Geco–Prakla understands that U.P.R.C assumes all responsibility for any damages or costs to this water well resulting from Shot Points shot in the vicinity's [sic] as listed below:
>
> . . . .
>
> Agreed and accepted on Nov. 23, 1997.
>
> by /s/ B.D. Bates

There is no language in the contract indicating the contract was for the benefit of the Burkes. An indemnity agreement does not create third-party beneficiary status unless the third party is a creditor beneficiary and the contract was formed

for his or her benefit. *MCI Telecomm. Corp.*, 995 S.W.2d at 651; *Hurley*, 569 S.W.2d at 603. The agreement simply does not support a claim of third-party beneficiary for the Burkes. Without privity of contract or a clear indication the Burkes were third-party beneficiaries, the Burkes cannot recover on this contract.

### The Burkes' Pleadings

█ In its third point of error, UPRC argues that the pleadings were insufficient as to the damages to the dead cattle and weight loss to the cattle. Because the Burkes did not include the deceased cattle and the decreased weight loss to the cattle as damages in their petition, UPRC argues these damages cannot be awarded.

The Burkes contend the damages due to the dead cattle and decreased weight gain are direct damages rather than special damages. The case cited by the Burkes, i.e., *Humble Pipe Line Co. v. Day,* 172 S.W.2d 356, 358 (Tex.Civ.App.-Waco 1943, writ ref'd w.o.m.), did involve both dead cattle and weight loss to the cattle. However, the discussion of special damages is limited to the decrease in market value of the land. In *Day,* a landowner brought suit for damage to her land and cattle caused by large quantities of crude oil which escaped from a nearby pipeline and settled in and near a creek running through her farm. *Id.* Humble argued that the decreased value of the land was a special damage, and the court held that the damage to the land was a direct damage because it was reasonably foreseeable. *Id.* *Day* does not stand for the proposition that the dead cattle and weight loss were direct damages, although the court did allow Day to recover for the dead cattle and weight loss.

█ Our analysis is that the dead cattle and the decreased weight gain of the

surviving cattle are special damages rather than direct or general damages. Direct damages "flow naturally and necessarily" from the wrong and "compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997). "Special damages are those that proximately result from the defendant's wrongful conduct but are of such an unusual nature that they would normally vary with the circumstances of the individual case in which they occur." *Sherrod v. Bailey*, 580 S.W.2d 24, 28 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.). Special damages are those damages "which result naturally, but not necessarily, from the acts complained of." *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex.1992) (Phillips, J., concurring); *see Arthur Andersen & Co.*, 945 S.W.2d at 816.

The death of cattle and the losses incurred due to the decreased weight gain do not necessarily flow from damage to a water well. They are damages which will normally vary with the circumstances of each case. The damages resulted from the sand, which caused the calves stress and increased their susceptibility to illnesses. The damages did not naturally and necessarily flow from the damage to the well. Further, the losses due to decreased weight gain are analogous to lost profits, which have consistently been held to be special damages in Texas. *See Naegeli Transp. v. Gulf Electroquip, Inc.*, 853 S.W.2d 737, 739 (Tex.App.-Houston [14th Dist.] 1993, writ denied). Our conclusion is that the damages due to the dead cattle and the decreased weight gain of the cattle are special damages.

■ Under the common law, "special damages" are not recoverable unless the defendant had notice that the plaintiff would suffer such damages. *Id.* "When items of special damage are claimed, they shall be specifically stated." Tex.R. Civ. P. 56. In order to be recoverable, special damages must be pled. *Lesikar v. Rappeport*, 33 S.W.3d 282, 306 n. 1 (Tex.App.-Texarkana 2000, pet. denied); *see Bynum*, 836 S.W.2d at 163 (Phillips, J., concurring).

■ Before our analysis progresses any further, we must determine whether error was preserved. Rule 90 of the Texas Rules of Civil Procedure requires that any defect "either of form or of substance" must be "pointed out by exception in writing" and brought to the attention of the trial court. Tex.R. Civ. P. 90. UPRC did not specially except to the pleadings or object to the introduction of evidence concerning the special damages. However, UPRC did object to the submission of the damage question to the jury on the basis that the damages resulting from the dead cattle and the decreased weight gain of the cattle were not "supported by Plaintiffs' general pleadings." Because UPRC objected to the submission of the issue to the jury, the issue was not tried by consent. *See* Tex.R. Civ. P. 67; *see also Matthews v. Gen. Accident Fire & Life Assurance Corp.*, 161 Tex. 622, 343 S.W.2d 251, 255 (1961); *Harkey v. Tex. Employers' Ins. Ass'n*, 146 Tex. 504, 208 S.W.2d 919, 923 (1948). Therefore, error was preserved for our review.

■ The trial court, though, did not abuse its discretion in submitting the question concerning damages to the jury. In order to warrant submission to the jury, the issues must be raised by both the pleadings and the evidence. Tex.R. Civ. P. 278; *City of Princeton v. Abbott*, 792 S.W.2d 161, 167 (Tex.App.-Dallas 1990, writ denied). The sufficiency of the pleadings is judged based on whether they provide the opponent with fair and adequate notice. *Roark v. Allen*, 633 S.W.2d 804,

809–10 (Tex.1982); *Howell v. Mauzy,* 899 S.W.2d 690, 707 (Tex.App.-Austin 1994, writ denied). The purpose of this rule is to allow an opposing party to adequately prepare for trial. *Roark,* 633 S.W.2d at 810. "Fair notice" requires that "an opposing attorney of reasonable competence" can ascertain the nature and basic issues of the controversy. *City of Alamo v. Casas,* 960 S.W.2d 240, 251 (Tex.App.-Corpus Christi 1997, pet. denied). In order for the pleadings to be sufficient, the defendants must have fair notice of the special damages being asserted. *See Sherrod,* 580 S.W.2d at 28 (holding that defendants did not have fair notice that "damages to the improvements" were being sought).

■■■■ The Burkes argue that the DTPA demand letter, which was attached to the pleadings, is sufficient to meet the pleading requirement. A party may attach and incorporate into its pleadings written instruments "constituting, in whole or in part, the claim sued on, or the matter set up in defense." TEX.R. CIV. P. 59. UPRC contends that the demand letter cannot be incorporated into the pleadings because it does not constitute the claim sued on. The notice requirement of the DTPA must be pled. *Hines v. Hash,* 843 S.W.2d 464, 467 (Tex.1992). Because notice must be pled in a DTPA action, we conclude that notice under the DTPA forms part of the DTPA claim or a matter concerning a defense. *See Houston Cmty. Coll. Sys. v. Schneider,* 67 S.W.3d 241, 242–43 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (copies of worker's compensation proceedings incorporated into the pleadings); *Skepnek v. Mynatt,* 8 S.W.3d 377 (Tex.App.-El Paso 1999, pet. denied) (attached affidavit in support of special appearance deemed incorporated). Therefore, the DTPA demand letter was incorporated as part of the Burkes' DTPA claim against PWW. The remaining issue is whether the enumeration of special damages in the DTPA claim is sufficient to plead those special damages against another defendant, specifically UPRC, in a different cause of action, specifically breach of contract.

■■■■ The incorporation of the DTPA demand letter provided UPRC with fair notice of the special damages. In the attached letter, the Burkes listed the following damages: "the Burkes waited over a year without potable water and suffered a loss of use of their residence, expenses in transporting cattle, weight loss on cattle, and death of cattle...." In their petition, the Burkes alleged:

> The damages suffered by Plaintiffs in connection with the Defendants' improper, wrongful, and/or negligent conduct in this case are in excess of the minimum jurisdictional limits of this Court. At this point in time, Plaintiffs' damages are in an amount not less than $204,321.50; however, Plaintiffs expressly and specifically reserve the right to amend and/or supplement the aforementioned damages figure as this litigation progresses.

This is the only paragraph in the petition other than the attachment which addresses the Burkes' damages. The petition clearly indicates that the same damages are being brought against all defendants. The Burkes use the plural form of "defendants," indicating that the paragraph is referring to multiple defendants. Further, it is clear that all of the injuries came from the same injury, i.e., the sand in the well. When there are no special exceptions, a petition will be construed liberally in favor of the pleader. *Roark,* 633 S.W.2d at 810. Since the petition alleges the same damage amount against all defendants, any attorney of reasonable competence would have fair notice that the special damages enumerated in the attached DTPA letter are being asserted against all the defendants.

UPRC cites *Employers Casualty Co. v. Transport Insurance Co.* for the proposition that the attachment does not provide fair notice. *Employers Cas. Co. v. Transport Ins. Co.*, 444 S.W.2d 606, 610 (Tex. 1969). *Employers Casualty*, though, held that neither the pleading nor the attachment gave fair notice that the plaintiff was seeking "recovery in subrogation." *Employers Cas. Co.*, 444 S.W.2d at 610. In this case, the attachment does provide fair notice that special damages for the dead cattle and the decreased weight gain of the cattle were being sought. Further, the depositions of Russell and Lori Burke indicate that UPRC was well aware that the Burkes were seeking damages for the dead cattle and the decreased weight gain of the surviving cattle.

In this case, the pleading against PWW, which specifically pled the special damages, provided fair notice to UPRC that the same special damages would be asserted against them. We are not holding that special damages pled against one defendant will always be sufficient against other defendants. However, in this case, the pleading gave fair notice of the special damages to UPRC. Because we are to liberally construe pleadings in favor of the pleader in absence of any written special exceptions, the pleadings did specifically plead the special damages.[4]

### Sufficiency of the Evidence of the Damages

In its points of error four and five, UPRC argues there is insufficient evidence

of the actual damages. The jury awarded the Burkes $1.5 million in actual damages. Question B asked the jury:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Burkes for their damages, if any, resulting from the occurrence in question?
>
> . . . .
>
> Consider the following elements of damages and none other:
>
> a. losses incurred on weight gain of cattle that were a natural, probable, and foreseeable consequence of Union Pacific Resources failure to comply
>
> b. losses incurred on dead cattle that were a natural, probable, and foreseeable consequence of Union Pacific Resources failure to comply
>
> c. reasonable and necessary cost incurred in repairing the water well in question

At trial, the Burkes' counsel requested $700,000.00 for the decreased weight gain, $400,000.00 for the dead cattle, and $7,600.00 for the well repair. The Burkes did not request damages related to increased veterinary expenses. In total, the Burkes requested that the jury award $1,107,600.00 in actual damages. The jury awarded $1.5 million.

UPRC argues there is no evidence of "reasonable and necessary" costs to repair

---

4. UPRC argues it was "sandbagged" at trial and was not aware the plaintiffs were seeking such a large amount of damages. The petition provides that the damages are "not less than $204,321.50." However, the record does not contain a written special exception demanding that the Burkes plead the maximum amount claimed. *See* Tex.R. Civ. P. 47. In the absence of a written special exception, UPRC has waived any defect as to the amount. *See* Tex.R. Civ. P. 90. UPRC was aware the Burkes were seeking damages for the dead cattle and decreased weight gain and were able to prepare its defenses accordingly. Because UPRC did not specifically except in writing to the failure to plead a maximum amount of the damages, any pleading defect as to the amount of the damages is not preserved for review.

the well. UPRC asks us to "delete" and "overturn" the damage finding of $1.5 million. UPRC also alleges the award was excessive and not supported by the evidence. These allegations challenge both the legal and factual sufficiency of the evidence. UPRC preserved the error for both the legal and factual sufficiency reviews. In its motion for judgment notwithstanding the verdict, it argued there was no evidence of the damages and ob-jected to the submission of the jury question on the basis that there was no evidence. UPRC argued in its motion for new trial that the damages were excessive.

On appeal, the Burkes argue that the damage award can be supported by the evidence. The evidence was that the Burkes processed 14,000 cattle in the operation. We understand the Burkes' argument concerning damages as follows:

| | |
|---|---|
| Weight Gain: | 14,000 × $50.00 = $700,000 |
| Veterinary Expenses (Weight Gain): | 14,000 × $40.00 = $560,000 |
| Dead Cattle: | 500 replaced cattle × $500 = $250,000 |
| Well Repair: | $ 7,800 |
| | $1,617,800 |

Thus, the Burkes argue the jury could have awarded a total of $1,617,800.00. We note the Burkes are not contending the jury could have awarded damages for dead cattle which the Burkes did not replace. Lori Burke testified that 1,200 to 1,300 cattle died. Of the dead cattle, the Burkes replaced approximately 500. It is unclear as to the ownership of the remaining 800 dead cattle. It appears that some of the cattle were owned in some form of partnership.

■ On appeal, the Burkes argue that the jury's award is supported by the evidence because of the increased cost of veterinary care caused by the sand in the water. We disagree that the veterinary expenses can be awarded as part of the loss due to the decreased weight gain element of damage. The Burkes contend that the veterinary expenses are related to decreased weight gain of the cattle. Our conclusion is that the veterinary expenses are too dissimilar from the decreased weight gain to be awarded under that element. No question was submitted to the jury concerning the increased veterinary expenses. Because the veterinary expenses are not attributable to "losses incurred on weight gain" of the cattle, they cannot be used to support the award.

In addition, the amount of the increased veterinary costs argued by the Burkes is unsound. The forty-dollar figure asserted by the Burkes referred to testimony that, when a calf died, the calf that replaced it would then have to be vaccinated. This resulted in an increased cost of forty dollars per head rather than twenty dollars per head. The testimony pertained only to the replaced cattle. Thus, this evidence provides evidence of damages in the amount of $10,000.00 (500 replaced cattle × ($40.00 − $20.00)), rather than $560,000.00. The veterinarian testified that vaccination costs were increased by the lack of water, because the medicines would not perform as well when cattle were dehydrated. The Burkes have not shown where evidence of these increases can be found in the record. Further, as discussed above, the Burkes did not submit a question concerning veterinary expenses.

■ The remaining damages asserted by the Burkes are supported by the evidence. As a result of the problems with sand in the well, Lori Burke testified their cost to increase a calf's weight was much greater than the average cost. On average, the calves in their operations gained

only one and a half pounds per day instead of the expected two and a half pounds. In total, the decreased weight gain resulted in a loss of twenty-five dollars per head per month. Since each calf stayed at the feedlot an average of two months, the Burkes lost fifty dollars per head. The Burkes replaced approximately 500 head of the dead cattle for their customers. Lori Burke testified that the cattle were selling on average between $400.00 and $500.00 per head. Russell testified that it cost $7,800.00 to repair the well. Thus, the maximum amount supported by the evidence is as follows:

| | |
|---|---|
| Decreased Weight Gain - 4,000 head × $50/per head | $700,000 |
| Dead Cattle: | |
| Replaced Cattle - 500 head × $500/per head | $250,000 |
| Well Repair - 7,800 | $ 7,800 |
| | $957,800 |

These calculations assume that cattle were selling at the maximum price of $500.00 per head. Thus, the jury's award of $1.5 million is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

### Settlement Credit

■ UPRC argues it is entitled to credit for the Schlumberger settlement. The Burkes and PWW settled with Schlumberger before trial for $125,000.00. Of this amount, $13,500.00 was awarded to PWW. UPRC argues it is entitled to a settlement credit under the one satisfaction rule. The Burkes contend the Schlumberger settlement could have been attributable to damages other than those asserted against UPRC.

■ When a single, indivisible injury occurs, the plaintiff may recover only once for that injury. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex.1991); *Facciolla v. Linbeck Constr. Corp.*, 968 S.W.2d 435, 449 (Tex.App.-Texarkana 1998, no pet.). The party seeking a settlement credit has the burden to prove its right to such a credit. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex.1998); *Cohen v. Arthur Andersen, L.L.P.*, 106 S.W.3d 304, 310 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The party must prove the settlement amount and introduce in the record either the settlement agreement or some evidence of the settlement amount. *Ellender*, 968 S.W.2d at 927; *Cohen*, 106 S.W.3d at 310. "If the nonsettling party meets this burden, the burden shifts to the plaintiff to tender a valid settlement agreement allocating the settlement between (1) damages for which the settling and nonsettling defendant [sic] are jointly liable, and (2) damages for which only the settling party was liable." *Cohen*, 106 S.W.3d at 310; *see Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391–92 (Tex.2000). The plaintiff is in the better position to prove the proper allocation of the settlement. *Ellender*, 968 S.W.2d at 928. If the plaintiff fails to satisfy this burden, then the nonsettling party is entitled to a credit equaling the entire settlement amount. *Cohen*, 106 S.W.3d at 310; *see Ellender*, 968 S.W.2d at 928.

UPRC introduced the settlement agreement into the record. Therefore, the burden shifted to the Burkes to prove the damages for which only the settling party was liable. On appeal, the Burkes argue that the Schlumberger settlement can be attributed to damages for loss of the use of their residence and additional costs in transporting cattle. Although pled in their eighth amended petition, neither of these damages was submitted to the jury. However, the record does not indicate the Burkes made this argument to the trial

court. The Burkes argued to the trial court that UPRC was responsible for proving the proper allocation of the settlement. Because the Burkes failed to meet their burden of proving the damages solely attributable to Schlumberger, the full amount of the settlement should be credited toward the judgment. The award should be reduced by $111,500.00.

### PWW's Tortious Interference Claim

█ UPRC contends in its seventh point of error that PWW's tortious interference with contractual relations claim is barred by the statute of limitations. UPRC argues that the discovery rule does not apply to claims of tortious interference as a matter of law because these types of injuries are neither inherently undiscoverable nor objectively verifiable. This Court has noted that the discovery rule is a "very limited exception" to the statute of limitations. *Schindley*, 13 S.W.3d at 67. The discovery rule only applies when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable. *Altai, Inc.*, 918 S.W.2d at 456. As discussed below, there is sufficient evidence to support the jury's finding as to the discovery date of the injury. For purposes of this discussion, we will assume that the discovery rule applies.

PWW argues that tortious interference should be governed under the residual statute of limitations, Section 16.051, instead of Section 16.003. Section 16.051 provides that "[e]very action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (Vernon 1997). In *Dickson Construction, Inc.*, this Court noted that the Texas Supreme Court may have erred in *First National Bank of Eagle Pass v. Levine. Dickson Constr., Inc.*, 960 S.W.2d at 849; *see First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287, 289 (Tex.1986) (holding that tortious interference with business relations was within the meaning of trespass in Section 16.003). In our opinion, we criticized the Texas Supreme Court's interpretation of the statute to require a tortious interference cause of action to be brought within two years. *Dickson Constr., Inc.*, 960 S.W.2d at 849. As we held in *Dickson Construction*, we adhere to the application of Section 16.003 to tortious interference claims until the Texas Supreme Court changes its interpretation.

█ Even assuming the discovery rule applies, there is sufficient evidence to support the jury's answer concerning the discovery date of the injury. The jury found that PWW knew or should have known of the tortious interference on January 1, 1998. We believe this finding is supported by the evidence. As previously discussed, Pritchett was concerned about the seismic testing and informed the crew about the water well. When PWW drilled the well in December 1997, it produced potable water without sand. However, when the pump was installed around the beginning of January 1998, the well water contained excessive amounts of sand. Pritchett filed an affidavit earlier in the case in which he stated that Russell Burke accused the seismograph survey of tearing up the well when the pump was installed. At this point, a rational juror could have concluded PWW knew or should have known that a third party had committed tortious acts. Further, the great weight and preponderance of the evidence is not so contrary to the jury's conclusion that it indicates the result is clearly wrong. PWW originally countersued UPRC on August 28, 2000, which was more than two years from January 1, 1998. Therefore, the statute of limitations bars PWW's claim even if the

discovery rule applies.[5] Because the statute of limitations is dispositive, we will not address UPRC's remaining points of error.

### PWW's Attorney's Fees

■ PWW also contends it can recover attorney's fees because it prevailed against the Burkes on the breach of contract claim. PWW did not request recovery at the trial court level for attorney's fees based on breach of contract. No question solely concerning attorney's fees was submitted to the jury. The question that was submitted to the jury was clearly intended to be for the tortious interference claim and combined both attorney's fees and the cost of the attempted repairs to the well. We deny PWW's claim for attorney's fees.

### Conclusion

Both the Burkes' negligence claim and PWW's tortious interference with business relations claim are barred by the statute of limitations. We render a take-nothing judgment concerning PWW's tortious interference claim. The evidence is factually insufficient to support the Burkes' recovery of $1.5 million for contract damages. Further, the trial court abused its discretion in not awarding a settlement credit to UPRC in the amount of $111,500.00. If the Burkes, within fifteen days from the date of our opinion, file a remittitur of $653,700.00 from the damages awarded by the trial court, we will modify the trial court's judgment to award the Burkes a recovery of $842,300.00 in damages, plus prejudgment interest of $358,552.84, and postjudgment interest at the rate of ten percent per annum. If the Burkes fail to remit $653,700.00, the judgment will be

reversed, and the cause remanded for a new trial.

## OPINION ON MOTION FOR REHEARING

Both UPRC and PWW have filed motions for rehearing. PWW argues this Court erred in holding that its suit was barred by the statute of limitations. UPRC argues this Court erred in not considering whether there was sufficient evidence that the repair costs to the well were reasonable and necessary and in awarding interest at a rate of ten percent. In its supplement to its motion for rehearing, UPRC argues that this Court erred in allocating the costs among the parties and argues for the first time on appeal that Russell and Lori Burke lack standing. We overrule the motions for rehearing.

### PWW's Motion for Rehearing

■ PWW contends we erred in holding that its suit was barred by the statute of limitations. PWW argues that it was not until it was sued for breach of contract that it became aware of the tortious interference with business relations. This argument fails because, even if the discovery rule applies, the test is when PWW became aware of interference with its business relationship rather than when the extent of the damages became known. The discovery rule exception defers accrual of a cause of action until the plaintiff knew or should have known of the facts giving rise to the cause of action. *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex.1994); *Dickson Constr., Inc. v. Fid. & Deposit Co.*, 960 S.W.2d 845, 850 (Tex.App.-Texarkana 1997, no pet.). The tortious interference

---

5. At oral argument, PWW argued that the statute of limitations was tolled due to fraudulent concealment. We note there is some evidence of fraudulent concealment on the

part of UPRC. However, this issue was not argued at the trial level and there is no jury finding on this issue.

with business relations occurred when the well was damaged, not when the Burkes filed suit. There is sufficient evidence to support the jury's determination that PWW knew or should have known by January 1, 1998, that UPRC had damaged the well and thus interfered with its contract. The fact that the extent of the damages caused by the interference did not become apparent until it was sued by the Burkes does not toll the statute of limitations.

 PWW also contends the effect of our ruling violates the open courts provision of the Texas Constitution. *See* Tex. Const. art. I, § 13; *Trinity River Auth.*, 889 S.W.2d at 261; *Sax v. Votteler*, 648 S.W.2d 661, 665 (Tex.1983). In *Trinity River Authority*, the Texas Supreme Court held that the statute of limitations did not violate the open courts provision. *Trinity River Auth.*, 889 S.W.2d at 261. In *Sax*, the Texas Supreme Court held that a limitations statute limiting a minor's opportunity to file a malpractice suit violated the open courts provision because it effectively abolished the minor's right to assert the cause of action. *Sax*, 648 S.W.2d at 667. Our situation is distinguishable because PWW could have sued when it became aware that the well was damaged even though PWW did not know the full extent of the damages at that time.

PWW suggests that we 1) allow an equitable tolling exception, 2) apply the residual limitations statute, or 3) apply the discovery rule. We analyzed the statute of limitations based on the discovery rule. We also rejected the residual limitations statute based on the most recent Texas Supreme Court analysis. *See First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986). PWW did not assert any equitable tolling exception at the trial court level.

We overrule PWW's motion for rehearing.

### UPRC's Motion for Rehearing

 In its original motion for rehearing, UPRC argues that our opinion failed to address whether the water well repair cost was reasonable and necessary. UPRC also contends the judgment interest rate should be five percent rather than ten percent.

 UPRC's first contention is that the Burkes failed to show that the cost of $7,800.00 to repair the well was reasonable and necessary. A party seeking recovery for the costs of repairs must prove they are reasonable. *Fort Worth Hotel Ltd. P'ship v. Enserch Corp.*, 977 S.W.2d 746, 762 (Tex.App.-Fort Worth 1998, no pet.). A party does not have to use the magic words "reasonable and necessary," but need only present sufficient evidence to justify a jury's finding. *Id.* The Burkes presented evidence that the well was pumping excessive amounts of sand, which made the water unsuitable for the use intended. Evidence at trial indicated this problem was caused by a hole or similar disruption in the screen. Jere Pritchett testified he made several attempts to repair the well, but was unsuccessful. Although he did not charge the Burkes, Pritchett incurred costs of $10,000.00 in attempting to repair the well. Travis Russell was able to patch the well and charged the Burkes $7,800.00 for the patch. The patch cost less than Pritchett's unsuccessful repairs and much less than the original cost of the well. Based on this evidence, a rational juror could have concluded that the repairs were reasonable and necessary, and such a conclusion is not against the great weight and preponderance of the evidence.

 UPRC's second contention is that the judgment interest rate should be five percent rather than ten percent. UPRC

argues that the new version of TEX. FIN. CODE ANN. § 304.003(c) applies because this Court's opinion constitutes a judgment and the new provision applies to a judgment which will be "signed or subject to appeal." *See* Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2, 2003 Tex. Gen. Laws 2097.

During the last regular session, the Texas Legislature amended the postjudgment interest rate. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096–97 (codified at TEX. FIN. CODE ANN. § 304.003(c) (Vernon Supp. 2004)). Section 304.003(c) of the Texas Finance Code now provides:

> (c) The postjudgment interest rate is:
>
> > (1) the prime rate as published by the Federal Reserve Bank of New York on the date of computation;
> >
> > (2) five percent a year if the prime rate as published by the Federal Reserve Bank of New York described by Subdivision (1) is less than five percent; or
> >
> > (3) 15 percent a year if the prime rate as published by the Federal Reserve Bank of New York described by Subdivision (1) is more than 15 percent.

TEX. FIN.CODE ANN. § 304.003(c).

The interpretation of a statute is a question of law. *In re Canales*, 52 S.W.3d 698, 701 (Tex.2001) (orig.proceeding). The Fort Worth Court of Appeals has held that the amendments apply only "where a judgment is signed on [or] after the effective date of the Act and to cases where a judgment becomes subject to appeal, i.e., capable of being appealed, on or after the effective date of the Act." *Columbia Med. Ctr. v. Bush*, 122 S.W.3d 835, 865 (Tex. App.-Fort Worth 2003, pet. denied); *see Warrantech Corp. v. Computer Adapters Servs.*, No. 02–03–002–CV, 2004 Tex.App. LEXIS 3212, 2004 WL 742742 (Tex.App.-

Fort Worth Apr. 8, 2004, no pet. h.); *see also Utts v. Short*, No. 03–03–00512–CV, 2004 WL 635342 (Tex.App.-Austin Apr. 1, 2004, no pet. h.) (not designated for publication).

We note that all of our sister courts' opinions affirmed the judgments of the trial courts and that we reversed and rendered concerning PWW and suggested a remittitur concerning UPRC's appeal. However, our sister courts' opinions indicate that "judgment" in the act refers to the trial court judgment rather than a judgment by a court of appeals. In *Columbia Medical Center*, the Fort Worth Court of Appeals held that "[t]he plain meaning of the phrase 'subject to an appeal' when used to describe a judgment traditionally means that the judgment fully and finally disposes of all parties and all issues before the trial court and therefore is capable of being appealed." *Columbia Med. Ctr.*, 122 S.W.3d at 865. We hold that the new version of Section 304.003(c) applies to a case in which a final judgment is signed in the trial court or subject to appeal from the trial court on or after June 20, 2003. Since the judgment was signed by the trial court and appeal was taken well before the effective date of the new version of Section 304.003(c), it does not apply.

The trial court signed the final judgment in this case January 10, 2003. This judgment contained a prejudgment and postjudgment interest rate of ten percent. At the time the judgment was signed in the trial court, Section 304.003(c) provided:

> (c) The postjudgment interest rate is:
>
> > (1) the auction rate quoted on a discount basis for 52–week treasury bills issued by the United States government as most recently published by the Federal Reserve Board before the date of computation;

(2) 10 percent a year if the auction rate described by Subdivision (1) is less than 10 percent; or

(3) 20 percent a year if the auction rate described by Subdivision (1) is more than 20 percent.

Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18, 1999 Tex. Gen. Laws 222, 232 (amended 2003) (current version at TEX. FIN.CODE ANN. § 304.003(c)). Thus, the applicable interest rate was ten percent. We overrule UPRC's motion for rehearing.

## UPRC's Supplement to Motion for Rehearing

In its supplement to its motion for rehearing, UPRC alleges two more errors in this Court's opinion. UPRC contends that we erred in allocating the costs among the parties and that the Burkes lack standing to pursue the appeal.

 The first alleged error argued by UPRC is that this Court erred in allocating the costs of the appeal among the parties. This Court ordered UPRC to pay one half of the costs, the Burkes to pay one third of the costs; and for PWW to pay one sixth of the costs. UPRC argues that we should have applied Rule 139 of the Texas Rules of Civil Procedure and ordered that the Burkes and PWW pay the costs. UPRC argues that, since Rule 139 is more specific than Rule 43.4 of the Rules of Appellate Procedure, it should govern the award of the costs. See TEX.R. CIV. P. 139; TEX.R.APP. P. 43.4.

Rule 43.4 provides that a court of appeals should award costs to the prevailing party. TEX.R.APP. P. 43.4. We followed the prevailing party rule in allocating costs. However, no party prevailed on all of the principal issues. Given that there were multiple appeals and multiple parties prevailing, we allocated the costs accordingly.

The general rule is that the specific rule will control over the general rule. See TEX. GOV'T CODE ANN. § 311.026 (Vernon 1998). However, we cannot say that Rule 139 is more specific than Rule 43.4. Both rules are comprehensive on their face. See TEX.R. CIV. P. 139; TEX.R.APP. P. 43.4 If the rules were irreconcilable, Rule 43.4 would govern as the more recent rule. See TEX. GOV'T CODE ANN. § 311.025 (Vernon 1998). However, we believe the rules can be harmonized. When presented with a potential conflict among different rules, the rules should be construed, if possible, to give effect to both.

The rules can be harmonized because the court may award costs to the prevailing party, otherwise as required by law, or otherwise for good cause. Rule 43.4 provides that the court "may tax costs otherwise as required by law or for good cause." TEX.R.APP. P. 43.4. The word "may" indicates that such an action is at the discretion of the court. See TEX. GOV'T CODE ANN. § 311.016 (Vernon 1998). We conclude Rule 139 falls within the meaning of "otherwise required by law" and could be followed at the court's discretion. However, the court may award costs other than to the prevailing party based on "good cause." See Burns v. Bishop, 48 S.W.3d 459, 468 (Tex.App.-Houston [14th Dist.] 2001, no pet.); Keene Corp. v. Gardner, 837 S.W.2d 224, 232 (Tex.App.-Dallas 1992, writ denied); see also Lesikar v. Rappeport, 809 S.W.2d 246, 253 (Tex.App.-Texarkana 1991, no writ) (op. on reh'g). Courts of appeals have considerable discretion in taxing costs on appeal. Save Our Springs Legal Def. Fund v. City of Austin, 874 S.W.2d 109, 110 11 (Tex.App.-Austin 1994, no writ). When both parties prevail on some issues but not others, courts have apportioned the costs of appeal between the parties. See, e.g., City of Austin v. Capitol Livestock Auction Co., 453 S.W.2d 461, 465 (Tex.1970).

Our distribution of the costs was based on which party prevailed on each portion

of the appeal and the magnitude of that portion of the appeal. Because this case involved multiple appeals of different magnitudes, we assessed the costs accordingly. The most substantial appeal was brought by UPRC against the Burkes. UPRC did not prevail on the principal issues and thus we assessed one half the costs of the appeal against UPRC. While monetarily significant, the Burkes' appeal against UPRC involved a less substantial substantive portion of the appeal. Since the Burkes did not prevail on their appeal, we assessed one third of the costs against them. Although UPRC prevailed on the portion of their appeal against PWW, this part of the appeal was intertwined with the appeal concerning the Burkes. As the least substantial portion of the appeal, we ordered PWW to pay one sixth of the costs of appeal.

■ The second contention of UPRC is that the Burkes lack standing due to their filing a bankruptcy action. UPRC argues the trial court erred in failing to dismiss the Burkes' suit. Standing is a component of subject matter jurisdiction; it cannot be waived and may be raised at any point. *Anderson v. New Prop. Owners' Ass'n*, 122 S.W.3d 378, 384 (Tex.App.-Texarkana 2003, pet. denied).

■ Once a bankruptcy petition is filed, the estate takes ownership of all the debtor's property, including his or her causes of action. 11 U.S.C.A. § 541(a) (West 1993); *Douglas v. Delp*, 987 S.W.2d 879, 883 (Tex.1999); *Texas Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, 143 (Tex.App.-Texarkana 2000, no pet.); *Carter v. Carter*, 21 S.W.3d 441, 443 (Tex.App.-San Antonio 2000, no pet.). However, "where an action is pending prior to the commencement of a bankruptcy proceeding a trustee has three options: (1) to assume prosecution of the pending action; (2) to consent to the debtor's continued prosecution of the action for the trustee's benefit; or (3) to decline to prosecute the pending actions if it appears the prosecution would be fruitless." *Carter*, 21 S.W.3d at 443.

This suit was pending at the time the Burkes declared bankruptcy. On January 12, 2000, the Burkes joined UPRC to the pending suit against PWW. On December 14, 2000, the Burkes filed for bankruptcy. Thereafter, the bankruptcy trustee joined this suit with the Burkes. In taking this action, it appears the bankruptcy trustee chose two of the possible options. He both assumed prosecution and consented to the debtor's continued prosecution for the trustee's benefit. The Fourteenth District Court of Appeals has suggested that, if a bankruptcy trustee has notice of a pending suit and does not intervene, he is deemed to have consented to the prosecution. *Sommers v. Concepcion*, 20 S.W.3d 27, 38–39 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (suit by a trustee is barred due to res judicata when he had notice of the debtor's prior prosecution). As a party, the trustee clearly had notice that the Burkes were continuing to prosecute the case. Therefore, we find the trustee consented to the prosecution and the Burkes have standing. Any recovery will inure to the trustee's benefit for the bankruptcy estate. We overrule UPRC's supplement to their motion for rehearing.

For the reasons stated, we overrule the motions for rehearing by PWW and UPRC. In accordance with the suggestion of a remittitur, the Burkes have filed a remittitur of $653,700.00. We modify the judgment of the trial court and, as modified, we affirm the Burkes' recovery of $842,300.00, plus prejudgment interest of $358,552.84 and postjudgment interest at the rate of ten percent per annum.