Affirmed and Memorandum Opinion filed February 27, 2007








Affirmed and Memorandum Opinion filed February 27, 2007.

 

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00908-CV

____________

 

GILBANE BUILDING COMPANY, Appellant

 

V.

 

TWO TURNERS ELECTRIC COMPANY D/B/A
TURNER ELECTRIC COMPANY, Appellee

 



 

On Appeal from the 151st
District Court

Harris County, Texas

Trial Court Cause No. 00-63143

 



 

M E M O R A N D U M   O P I N I O N

Appellant, Gilbane Building Company (AGilbane@), appeals a
judgment rendered on a jury=s award of damages in favor of appellee,
Two Turners Electric Company d/b/a Turner Electric Company (ATurner Electric@).  We affirm the
trial court=s judgment.








Factual and Procedural Background

In December 1997 Clear Creek Independent School District (ACCISD@) prepared to
build two schools: Space Center Intermediate and League City Intermediate. 
With each covering almost 170,000 square feet, the schools were large, nearly
identical, projects.   CCISD hired Gilbane as the general contractor in charge
of the construction of both schools. While Gilbane was a national building
company, it was new to Texas school construction, having previously completed
only two or three school projects. For the construction of these schools,
Gilbane served exclusively as the project supervisor, hiring subcontractors to
handle all aspects of the actual construction.  CCISD imposed an absolute
deadline of July 1, 1999 for the completion of both schools.  Based on that
deadline, Gilbane, as the general contractor, established the schedule for
performance which included no overtime or compressed time.  Gilbane then
solicited bids from subcontractors based on these specifications of normal work
weeks and approximately eighteen months to complete performance.

At the time of the events at issue in the trial, Daryl
Turner served as the president of Turner Electric.  Mr. Turner is a master
electrician who has been in business since 1968.  Mr. Turner has extensive
experience building schools as he has previously bid on and built approximately
twenty-five new school jobs as well as numerous smaller school projects.  As a
result of this experience, CCISD certified Turner Electric as one of eleven
electrical subcontractors pre-qualified to bid on CCISD construction projects. 
Turner Electric submitted a bid for both schools.  Mr. Turner prepared these
bids based on the knowledge and experience he gained as a master electrician
working on similar projects, the schedule prepared by Gilbane for the
construction, as well as Gilbane=s representations
that normal construction practices would be employed, and the subcontractors
would have approximately eighteen months to complete the construction of the
schools.[1]








Gilbane awarded the electrical subcontracts for both
schools to Turner Electric.  The two subcontracts contained nearly identical
language and pursuant to their terms, Turner Electric contracted to perform all
electrical work on both schools for a lump sum price.  Despite the fact both
subcontracts called for Turner Electric to perform all electrical work for a
lump sum price, both subcontracts, as well as the prime contract between CCISD
and Gilbane,[2]
envisioned there could be changes in the work and included provisions on how
those changes would be compensated.  Section 8.4 of both subcontracts provides
that if the parties cannot agree on a method to compensate a subcontractor for
additional work, this section would apply.  Section 8.4 provided for
compensation of the subcontractor=s costs plus a
reasonable allowance for overhead and profit.  In addition, section 8.4 defined
costs as the Acost of materials including sales tax and cost of
delivery, cost of labor including social security, old age and unemployment
insurance and fringe benefits required by [a]greement or custom; workers or
workmen=s compensation
insurance; bond premiums; rental value of equipment and machinery; and the
additional costs of supervision and field office personnel directly
attributable to the change.@  In addition, Section 8.6 allows a subcontractor
a five percent markup for work performed by a sub-subcontractor. 








Serious issues arose before and during the early stages of
the projects that dramatically impacted the construction of both schools.  The
most serious issue arose out of dimensional errors in the design drawings for
the schools.  As a result of these dimensional errors, the initial production
of structural steel was incorrectly fabricated.  The design errors resulted in
the structural steel not matching up or coming together properly.  Correcting
these design errors turned out to be a complicated and time consuming process. 
The problem was so significant that, as early as May 6, 1998, barely a week
after Turner Electric had executed the two subcontracts for the schools, Baker
Concrete, the foundation subcontractor, wrote Gilbane Athe dimensional
mistakes . . . have been known for well over three weeks.  To date, we still
have no complete answers.  This was not intended to be a >Fast Track= project, but at
this point it should be treated as such by the design team to maintain
progress.@  Two days later, Gilbane wrote a letter to the
architects on the project stating the dimension issue Aturned out to be
complicated and unavoidably disruptive@ bringing about a Asignificant delay
to the production and delivery of structural steel as a direct result of these
dimensional problems.@  Gilbane went on to notify the architects
it was completely suspending work in the affected areas of the projects and
told the architects Awe are unable to continue and we are being
constructively delayed in our efforts with resulting impacts to project time
and costs.@

While Gilbane was not responsible for the dimension errors
and the initial delays growing out of them, Gilbane made decisions in its
handling of the dimension problem that directly and adversely impacted Turner
Electric=s performance of
its duties under the subcontracts.  Each of these decisions resulted in Turner
Electric=s work being
compressed into a time significantly shorter than the amount of time originally
envisioned for the work.








Initially, Gilbane made the decision to give priority for
the fabrication of the structural steel to a Houston Independent School
District (AHISD@) school it was building even though the
two CCISD schools had already been delayed while the dimensional issue was
worked out by the architect and engineers.  This resulted in even more delays
in the fabrication, delivery, and erection of the structural steel.  Under the
original construction schedule established by Gilbane, the erection of the
structural steel for Space Center was to have started in June 1998 and been
completely installed by the middle of October 1998.[3] 
Instead, as a result of the delays in the fabrication of the structural steel,
as of September 1998, there was no structural steel on site at either school. 
In addition, by March 1999, only four months before the schools were to be
completed, there was still structural steel being erected at both schools. 
This delay directly impacted Turner Electric as much of its work, primarily the
installation of conduit and electrical lines, must be attached to the
structural steel and therefore cannot be performed before the steel itself is
installed.  The end result of Gilbane=s decision to give
the HISD school=s structural steel priority over the CCISD
schools was the compression of Turner Electric=s work into a
period of time significantly shorter than the originally scheduled eighteen
months.








The next decision to directly impact Turner Electric was
Gilbane=s unilateral
decision to put up the interior masonry walls before the structural steel was
in place in an effort to make up some of the lost time on the project.[4] 
According to Tom Singer, Gilbane=s former senior
project manager, Gilbane started looking for Asomething
[Gilbane] can do to move on that=s productive and
at the same time is overall positive, that - - that is, you know, beyond 50
percent positive.@  Gilbane made this decision without
consulting the subcontractors, despite the fact that it impeded some
subcontractors in the performance of their jobs.  Gilbane persisted in
following through with the decision even though, according to Mr. Singer, Aeverybody
questioned it and the wisdom of it.@  As a result of
Gilbane=s decision, the
interior masonry walls were built up to a height of approximately seven feet. 
This directly interfered with Turner Electric=s performance of
its job as there was no longer an open runway the length of the building for
the electricians to use motorized lifts to install the parallel runs of conduit
and electrical line once the structural steel was in place.  Instead, the
electricians had to resort to the time consuming and labor intensive process of
using ladders, with the necessity of setting up and breaking down their
equipment many times as they moved from room to room.  This not only slowed the
pace of the electricians= work, but also increased the number of
electricians required to perform the work because of the slow pace and the
compression of the time to perform. 








The third Gilbane decision to directly impact Turner
Electric=s performance was
Gilbane=s decision to
abandon the original sequence of constructing the schools.  Originally, Gilbane
intended to follow the Anormal@ method for
constructing a large school building.  Under the Anormal@ method, work
starts at one end of the building and progresses through to the other end. 
This method creates an efficient flow through the project as it allows each
subcontractor to work in a single area until it is complete.  This increases
efficiency as it minimizes repetitive setting-up and breaking down of equipment
as workers do not have to move back and forth from one area of the building to
another, as well as minimizing the amount of interference caused by too many
subcontractors working in a single area at the same time.  According to Mr.
Singer, Gilbane, in an effort to do something other than Asit on our hands,@ decided to
require the subcontractors to work in any area of the schools ready for work. 
In essence, Gilbane decided to work on both ends of the school buildings toward
the middle.  Mr. Singer testified the only advantage created by this decision
was it created the ability to work, but it did not allow the work to progress
efficiently.  Turner Electric was adversely impacted in several ways by Gilbane=s decision. 
First, the pace of the work slowed as the electricians had to move from one
area to another and then back again.  Second, because there were more
subcontractors working in a single area, efficiency decreased as they got in
each other=s way.  Finally, by leaving the middle of each school,
the section containing the bulk of the main electrical equipment, until the
end, Turner Electric=s time to complete its work was
dramatically compressed as the electricians had to wait until the latter stages
of the project, when the main electrical equipment was installed and
functional, to perform much of their work. 

Gilbane made the fourth decision impacting Turner Electric
toward the end of the projects.  Grinnell Fire Systems (AGrinnell@) was a direct
subcontractor of Gilbane for the installation of the fire alarm systems at both
schools.  In addition, Grinnell sub-subcontracted with Turner Electric for the
installation of the data, sound, and telephone systems.  As a result of Gilbane=s earlier
decisions, Grinnell=s work on all of the systems had been
compressed until the final months of the projects.  As the July 1 deadline
approached, Gilbane decided the fire alarm systems were more important than the
data, sound, and telephone systems, as, in Gilbane=s view, if each
school had a functional fire alarm system, it increased the chance CCISD would
accept the schools as complete even if significant work remained.  Therefore,
Gilbane ordered Grinnell to devote all its attention and resources to the fire
alarm systems and let the systems Turner Electric was responsible for, data,
sound, and telephone, wait.  This decision further compressed the time
available for Turner Electric to complete its work.

As a result of these decisions, Turner Electric=s time to perform
the work required under its subcontracts with Gilbane was significantly
compressed.  Mr. Singer even admitted the projects were seriously compressed. 
When a subcontractor=s time to perform is compressed, it means
more work must be performed in a shorter amount of time.  This, in turn,
requires the subcontractor to institute overtime for existing workers, hire
more workers, or both, raising the subcontractor=s labor costs.  In
addition, as the number of workers goes up, efficiency goes down as it is
difficult to supervise the larger number.  Finally, the compressed time
requires more subcontractors to work in the same areas at the same time in an
effort to get the work done with a resulting impact on efficiency.








Faced with a significantly compressed schedule, Turner
Electric worked hard to complete the schools.  According to Fred Niccum, Head
of Facilities for CCISD, the two buildings were a beehive of activity, even
late at night and on weekends, as electricians worked to get the buildings
completed on time.  In spite of all the problems, construction on the two schools
was sufficiently complete to allow Space Center to open to students on time
with League City opening only three days late.  However, there was still
considerable work to be done even after the schools opened as there were entire
areas of the schools that had not yet been closed in.  This work had to be
completed in the evenings and on weekends, times that required the payment of
overtime wages to the workers.

As soon as it became apparent that Turner Electric=s labor costs were
going to rise significantly, Turner notified Gilbane that Turner Electric would
not be responsible for paying the higher costs caused by others.  As the work
continued, both Gilbane and Turner Electric documented Turner Electric=s increased labor
costs with invoices, schedules of value, field reports, time cards, payroll
records, and overtime authorizations.[5]









When a subcontractor incurs increased costs as a result of
a compressed schedule, it is not allowed to present a claim directly to the
owner.  Instead, the subcontractor must present its claim to the general
contractor, which, in turn, has a responsibility to pass that claim on to the
owner for payment.  As the time approached to close out the two projects,
Turner Electric submitted a claim to Gilbane to be paid for the additional
labor costs it incurred as a result of the compressed schedule.  At this point,
Gilbane made the final decision impacting Turner Electric, deciding not to
present Turner Electric=s claim to CCISD for consideration. 
Marshall Lightman, Gilbane=s vice president and regional controller,
testified that Gilbane does not encourage the making of claims by
subcontractors, as, in his words, Ait=s not a good
practice.@  Instead, even though Lightman admitted at trial that
there were still open issues on Turner Electric=s payment, Gilbane
represented to CCISD that all subcontractors had been paid, and collected its
final payment on the projects. 

Ultimately, Turner Electric and Gilbane=s negotiations on
those open issues broke down when Gilbane made numerous deductions on the amount
owed to Turner Electric resulting in a balance due to Gilbane.  Litigation
eventually resulted from this dispute.  Turner Electric asserted both breach of
contract and fraud causes of action against Gilbane.  Gilbane counterclaimed
for the sums it claimed Turner Electric still owed.  The matter was submitted
to a jury and the jury found in favor of Turner Electric on both its breach of
contract and fraud causes of action, and against Gilbane on its breach of
contract cause of action.  Turner Electric elected to recover on its breach of
contract cause of action and the trial court entered judgment in favor of
Turner Electric in the amount of $532,504.75.  In addition, the judgment
awarded Turner Electric $76,490.00 for attorney=s fees incurred
through trial.  This appeal followed.  At oral argument Gilbane conceded there
was evidence in the record supporting the jury=s finding that
Gilbane breached its agreements with Turner Electric and therefore the only
contested issue in this appeal is the judgment=s award of damages
to Turner Electric.

The Standard of Review








In this appeal Gilbane challenges both the legal and
factual sufficiency of the evidence presented at trial.  When both legal and
factual sufficiency challenges are raised on appeal, we must first examine the
legal sufficiency of the evidence.  City of Houston v. Cotton, 171
S.W.3d 541, 546 (Tex. App.CHouston [14th Dist.] 2005, pet. denied)
(citing Trimble v. Tex. Dep=t of Protective
& Regulatory Serv., 981 S.W.2d 211, 217 (Tex. App.CHouston [14th
Dist.] 1998, no pet.).  In conducting a legal sufficiency review, we must
consider the evidence in the light most favorable to the verdict and indulge
every reasonable inference that supports it.  City of Keller v. Wilson,
168 S.W.3d 802, 821B22 (Tex. 2005); Harris County v.
Vernagallo, 181 S.W.3d 17, 24B25 (Tex. App.CHouston [14th
Dist.] 2005, pet. denied); Prairie View A & M Univ. v. Brooks, 180
S.W.3d 694, 705 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  The
evidence is legally sufficient if it would enable reasonable and fair-minded
people to reach the verdict under review.  Keller, 168 S.W.3d at 823; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  This court must credit
favorable evidence if reasonable jurors could, and disregard contrary evidence
unless reasonable jurors could not.  Keller, 168 S.W.3d at 822; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  The trier of fact is the
sole judge of the witnesses= credibility and the weight to be given
their testimony.  Keller, 168 S.W.3d at 819; Vernagallo, 181
S.W.3d at 24; Brooks, 180 S.W.3d at 705.  This court cannot substitute
our judgment for that of the jury, so long as the evidence falls within the
zone of reasonable disagreement.  Keller, 168 S.W.3d at 822; Vernagallo,
181 S.W.3d at 24; Brooks, 180 S.W.3d at 705.  But if the evidence allows
of only one inference, neither jurors nor the reviewing court may disregard it.
 Keller, 168 S.W.3d at 822; Vernagallo, 181 S.W.3d at 25; Brooks,
180 S.W.3d at 705.

This court may sustain a legal sufficiency, or no evidence,
point only if the record reveals one of the following: (1) the complete absence
of a vital fact; (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a scintilla; or (4) the
evidence conclusively proved the opposite of the vital fact.  Keller,
168 S.W.3d at 810; Brooks, 180 S.W.3d at 705.

In reviewing factual sufficiency, we must examine the entire
record, considering both the evidence in favor of, and contrary to, the
challenged findings.  See Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402,
406B07 (Tex. 1998); Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  We may set aside the verdict for
factual sufficiency only if it is so contrary to the overwhelming weight of
evidence as to be clearly wrong and unjust.  See Ellis, 971 S.W.2d at
406B07; Nip v.
Checkpoint Sys., Inc., 154 S.W.3d 767, 769 (Tex. App.CHouston [14th
Dist.] 2004, no pet.).  However, we may not substitute our judgment for that of
the jury, even if the evidence would clearly support a different result.  Nip,
154 S.W.3d at 769.








Discussion

A.      Was Turner
Electric=s Proof of Damages Sufficient?

In Gilbane=s first issue, Gilbane raises several
separate but related arguments that Turner Electric=s proof of its
damages is legally and factually insufficient.  First, Gilbane asserts Turner
Electric introduced insufficient evidence of a causal nexus between Gilbane=s actions and
Turner Electric=s damages.  Second, Gilbane argues Turner
Electric=s damages are
based on an improper measure of damages: the so-called ATotal Cost Method.@  Third, Gilbane
alleges there was insufficient evidence of the reasonableness of Turner
Electric=s costs.  Finally,
Gilbane argues the evidence was insufficient to establish the amount of
overhead and profit attributable to Turner Electric=s compression
claim.  We address each argument in turn.

1.       Turner
Electric Introduced Sufficient Evidence of a Causal Nexus Between Gilbane=s Actions and
Turner Electric=s Damages.

A subcontractor is entitled to recover damages from a
contractor for losses due to delay and hindrance of its work if the
subcontractor proves: (1) that its work was delayed or hindered; (2) that it
suffered damages as a result of the delay or hindrance; and (3) that the
contractor was responsible for the act or omissions which caused the delay or
hindrance.  See Shintech v. Group Constructors, 688 S.W.2d 144,
148 (Tex. App.CHouston [14th Dist.] 1985, no pet.) (stating elements
in a contractor-owner scenario).  In this first sub-issue, Gilbane argues there
was insufficient evidence connecting Gilbane=s admitted
breaches with Turner Electric=s damages. 








In this case the jury heard conflicting evidence relating
to the various problems that resulted in Turner Electric=s work on the
CCISD projects being compressed.  As laid out above, Turner Electric, through
documents and the testimony of numerous witnesses, presented evidence of
decisions, actions, or omissions by Gilbane that directly compressed the time
available for Turner Electric to perform its contractual obligations with a
resulting impact on Turner Electric=s costs.  In turn,
Gilbane presented evidence that Turner Electric=s problems arose
not from Gilbane=s acts or omissions, but from problems of
Turner Electric=s own creation.  This evidence included
testimony of (1) inadequate staffing of the job by Turner Electric; (2) poor
planning and supervision of Turner Electric=s work resulting
from Turner Electric=s decision not to participate in the
initial schedule planning session as well as occasional absences from weekly
planning meetings during the course of the project; (3) Turner Electric=s hiring of lower
quality and therefore less efficient electricians through staffing agencies;
and (4) Turner Electric=s tardiness in turning in required paperwork
relating to the products and materials to be used in the CCISD projects for
approval by the architect.  Although Gilbane disputes it was responsible for
Turner Electric=s compression damages, the jury found otherwise
and there is abundant evidence to support its finding.  As there is more than a
scintilla of evidence supporting the jury=s finding, the
evidence is legally sufficient.  In addition, the evidence is factually sufficient
as the finding is not so contrary to the overwhelming weight of evidence as to
be clearly wrong and unjust.

2.       Turner
Electric=s Damages Were Based on the
Contract Language Not the Total Cost Method.

In its second sub-issue Gilbane asserts that (1) Turner
Electric used an improper measure of damages, the Total Cost Method, to
calculate its damages; and (2) the evidence is legally and factually
insufficient to satisfy the elements of the Total Cost Method.  We disagree
Turner Electric used the Total Cost Method.








The ultimate goal in measuring damages for a breach of
contract claim is to provide just compensation for any loss or damage actually
sustained as a result of the breach.  Mays v. Pierce, 203 S.W.3d 564,
577 (Tex. App.CHouston [14th Dist.] 2006, pet. denied).  In addition,
the parties to a contract can agree to the remedy to be applied in the event
the agreement is breached.  Shasteen v. Mid-Continent Refrigerator Co.,
517 S.W.2d 437, 440 (Tex. Civ. App.CDallas 1975, writ
ref=d n.r.e.).  This
agreement on damages will be enforced by the courts unless it is illegal or against
public policy.  Id.

Turner Electric and Gilbane agreed on a measure of damages
in the two subcontracts in the event they could not agree on the amount of
compensation owed to Turner Electric.  There is no allegation this agreement is
illegal or against public policy.  Far from following the Total Cost Method,
which is universally disfavored according to Gilbane, Turner Electric=s damages track
the language found in the subcontracts.[6] 
As pointed out by Gilbane, section 8.4 of the subcontracts provides that in the
event the parties cannot agree on a method to compensate Turner Electric for
changes in the work, Turner Electric will be entitled to (1) a reasonable
allowance for overhead and profit; (2) the cost of materials including sales
tax and cost of delivery; (3) the cost of labor including social security, old
age and unemployment insurance, and fringe benefits; (4) the cost of workers compensation
insurance; (5) the cost of bond premiums; (6) the rental value of equipment and
machinery; (7) the additional costs of supervision and field office personnel
directly attributable to changes in the work; and (8) a five percent markup for
work performed by a sub-subcontractor.  As the dispute over Turner Electric=s compensation
wound up in litigation, it is obvious the parties could not agree on Turner=s compensation,
thus section 8.4 governs this dispute over Turner Electric=s compensation.








Turner Electric asked the jury to award the following as
elements of its damages caused by Gilbane=s breaches of the
subcontracts: (1) the net value of the written change orders; (2) the cost of
the staffing service electricians directly hired by Turner Electric as a result
of the compressed time to perform the subcontracts; (3) the five percent fee
for supervising the electrical sub-subcontractors hired by Gilbane and Turner
Electric as a result of the compressed time to perform the electrical work; and
(4) Turner Electric=s extra regular and overtime costs caused
by the compression of the projects plus a twenty percent burden, as allowed by
the subcontracts.  This burden covers Turner Electric=s profit (five
percent), overhead (ten percent), and the cost of taxes, insurance and
supervision (five percent).  Each element of these damages is permitted by
section 8.4 of the subcontracts between Gilbane and Turner Electric.  As Turner
Electric=s damages were not
calculated using the Total Cost Method but instead tracked the language in the
subcontracts, we overrule Gilbane=s second
sub-issue.[7]


3.       The
Evidence Was Legally and Factually Sufficient to Establish the Reasonableness
of Turner=s Costs.

In its third sub-issue, Gilbane argues the evidence was
insufficient to establish the reasonableness of Turner Electric=s damages.  Once
again, we disagree.








In a breach of contract case, a party seeking to recover
its costs has the burden to prove that the damages sought are reasonable.  See
Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc., 134 S.W.3d 195,
200 (Tex. 2004). Evidence of the amounts charged and paid, standing alone, is
no evidence that such payment was reasonable and necessary.  Id. at 200B01.  In Mustang
Pipeline the Supreme Court determined there was no evidence that Mustang=s costs were
reasonable.  Id. at 201.  However, Areasonable@ and Anecessary@ are not magic
words that a witness must speak to support a jury=s award.  Burke
v. Union Pac. Res. Co., 138 S.W.3d 46, 73 (Tex. App.CTexarkana 2004,
pet. denied).  Instead, a party need only present sufficient evidence to
support a jury=s finding.  Id.  

Initially, as discussed in section A(1) above, there was
substantial evidence that Gilbane=s decisions,
actions, or omissions compressed the time available for Turner Electric to
complete its work under the subcontracts.  As Mr. Singer testified, if a
construction project gets compressed, the compressed subcontractors are going
to experience increased costs.

There was evidence that Turner Electric=s original bids
were reasonable.  This includes Mr. Turner=s testimony that,
based on his more than thirty years experience as an electrician, which
includes the construction of twenty-five schools, he calculated the amount of
time required to perform all of the electrical work in the two projects, right
down to the installation of each electric plug and light fixture.  Then, using
Gilbane=s project schedule
and representations that Turner Electric would have the full contract time to
perform its work, Mr. Turner determined Turner Electric could complete both
projects using regular crews with no need to supplement the number of
electricians or any overtime work.  In addition, numerous witnesses testified
that, barring compression or other disruption of the construction schedule,
Turner Electric should have been able to complete both schools with no use of
overtime or supplemental labor.  This constitutes some evidence that Turner
Electric=s original bid
amount was reasonable.








Mr. Niccum testified, Awithout a doubt
[compression of the projects] had implications financially.@  For Turner
Electric, these financial implications were significant increases in the cost
of labor to complete the projects.  Turner Electric introduced evidence
demonstrating that the costs it incurred over the amount originally bid were
reasonable and necessary as required by Mustang Pipeline.  The evidence
was undisputed that CCISD had imposed an absolute date of July 1, 1999 for
substantial completion of the two projects.  If the deadline was not met, the
offending contractor or subcontractor could be exposed to liquidated damages of
$1,000 per day that the deadline was not met.  In addition, Mr. Turner
testified Gilbane repeatedly told the subcontractors, including Turner
Electric, there would be no extensions of time granted or requested from
CCISD.  When the time to complete the schools was compressed as a result of
Gilbane=s acts or
omissions, and faced with the absolute July 1, 1999 completion date, Turner
Electric had no choice but to hire additional electricians and work overtime.[8] 
As Mr. Turner testified, Turner Electric took the actions necessary to make
certain it could provide the needed manpower for the two jobs.  Mr. Turner
testified that his labor cost was $19.00 per hour.  At the same time, Gilbane
directly negotiated with two electrical companies to hire supplemental
electricians at an hourly rate of $14.75.  In addition to the hourly rate,
Gilbane agreed to pay the supplemental electricians a 50.15% burden amount plus
overhead and mark-up.  With overtime, the cost of this supplemental labor
exceeded $40.00 per hour.








The testimony recounted above constitutes some evidence
that the costs incurred by Turner Electric in completing the two projects were
both reasonable and necessary.  See Burke, 138 S.W.3d at 73 (concluding
that evidence comparing the cost of successfully repairing a well with the cost
of an unsuccessful repair attempt and the original cost of the well was
sufficient for a rational jury to conclude the cost of repair was reasonable
and necessary).  As there is more than a scintilla of evidence supporting the
reasonableness of Turner Electric=s costs, the
evidence is legally sufficient.  In addition, while Gilbane argues the evidence
is factually insufficient it fails to point out any contradictory evidence. 
Accordingly, the evidence is factually sufficient as the finding is not so
contrary to the overwhelming weight of evidence as to be clearly wrong and
unjust.  We therefore find the evidence supporting the reasonableness and
necessity of Turner Electric=s extra labor costs is both legally and
factually sufficient.  We overrule Gilbane=s third sub-issue.

4.       The
Evidence Supporting the Award of Overhead and Profit Was Legally and Factually
Sufficient.

In addition to granting the actual cost of the additional
time worked by Turner Electric employees, the judgment also included the award
of a twenty percent burden rate.  The burden includes compensation for profit
(five percent), overhead (ten percent), and taxes, insurance and supervisor
costs (five percent).  Turner Electric also received a five percent supervisory
fee for the work performed by the various contract electricians hired by Turner
Electric and Gilbane.  In Gilbane=s fourth
sub-issue, Gilbane attacks the sufficiency of the evidence supporting the
judgment=s award to Turner
Electric of specific percentage amounts within the burden for profit and
overhead, as well as the award of the sub-subcontractor supervisory fee to
Turner Electric. 

Initially, Gilbane relies on the language in the
subcontracts requiring the payment of overhead, profit, and a supervision fee
only if the claims arise out of a written change order.  In Gilbane=s view, because
there were no written change orders for the additional labor damages awarded in
the judgment, then Turner Electric cannot depend on the language found in the
subcontracts and instead must prove up its actual overhead and profit
attributable to the compression of the projects caused by Gilbane.  However,
Gilbane=s reliance on this
requirement of a written change order is misplaced.  When a contractor breaches
a construction contract, it relinquishes its contractual procedural rights
concerning change orders and claims for additional costs.  Shintech, 688
S.W.2d at 151.  Thus, the fact there was not a written change order authorizing
all of the additional work performed by Turner Electric does not preclude an
award of damages under the terms of the subcontracts authorizing compensation
for additional work.








Section 8.4 authorizes a subcontractor to receive a five
percent markup for work performed by a sub-subcontractor.  As the subcontracts
specifically permit a five percent supervisory fee for work performed by a
sub-subcontractor, Gilbane=s attack on the inclusion of such a fee in
the judgment is without merit.

As for the award in the judgment of ten percent for
overhead and five percent for profit, Turner Electric had to introduce evidence
establishing that such amounts were reasonable.  Here there was evidence
supporting that determination.  First, the Space Center subcontract, in
sections 8.3(c) and 12, addressing an alternative method for compensating
additional work performed by Turner Electric, specifically calls for the
payment of overhead in the amount of ten percent and a five percent profit. 
This is some evidence that the parties, Gilbane and Turner Electric, considered
such amounts reasonable.  In addition, Mr. Turner testified Gilbane and Turner
Electric negotiated, and agreed to, the twenty percent burden rate, which
includes overhead and profit.  Finally, the fact Gilbane agreed to pay the
contract electricians it directly hired to supplement the labor on the projects
overhead of ten percent and profit of ten percent serves as further evidence
that the rates awarded to Turner Electric were reasonable.  As there is legally
and factually sufficient evidence supporting the award of overhead, profit, and
a supervisory fee to Turner Electric, we overrule the fourth and final
sub-issue.

Having overruled each sub-issue, we overrule Gilbane=s first issue on
appeal.

B.      Turner
Electric Did Not Waive Its Claims or Fail to Comply With Conditions Precedent
for Making a Claim.








In its fourth issue, Gilbane makes two separate arguments. 
First, Gilbane argues the evidence conclusively established that Turner
Electric waived all claims for work that occurred prior to November 30, 1999. 
Second, Gilbane argues the evidence was insufficient to establish that Turner
Electric complied with the conditions precedent for making claims.  Again, we
address each argument in turn.

1.       Gilbane
Waived its Affirmative Defense of Waiver.

Waiver is the intentional relinquishment of a known right
or intentional conduct inconsistent with claiming that right.  4901 Main,
Inc. v. TAS Auto., Inc., 187 S.W.3d 627, 632 (Tex. App.CHouston [14th
Dist.] 2006, no pet.).  Waiver is an affirmative defense.   Tex. R. Civ. P. 94.  The failure to
request a jury question on an affirmative defense results in waiver by the
party relying on it unless the issue is conclusively established.  Tex. R. Civ. P.  279; XCO Prod. Co.
v. Jamison, 194 S.W.3d 622, 632 (Tex. App.CHouston [14th
Dist.] 2006, pet. denied).

Gilbane did not request a jury question on its affirmative
defense of waiver and therefore it must demonstrate that the evidence
conclusively establishes waiver.  In support of its argument, Gilbane points to
a APartial Release
and Waiver of Lien and Affidavit of Bills Paid@ (AReleases@) executed by
Turner Electric for both projects.  We disagree the Releases conclusively
establish Turner Electric waived all claims for work that occurred prior to
November 30, 1999.








The language of the Releases themselves work against
Gilbane=s argument.  The
Releases, which were executed on March 7, 2000, state: ASubcontractor
hereby waives, relinquishes and releases its lien, claims and charges of every
nature which have arisen by Subcontractor . . . to the extent such monies have
been paid . . .@  By their plain language, the Releases
exclude any sums that were still owed to Turner Electric as of March 7, 2000. 
There was extensive evidence, both testimony and documents, that, at the time
Turner Electric executed the Releases, there were outstanding sums still owed
to Turner Electric and that Gilbane had notice of those claims.[9] 
Turner Electric had presented its claims for the additional labor costs caused
by the compression of the projects to Gilbane prior to the execution of the
Releases.  Among the evidence showing this was a January 21, 2000 letter to
Gilbane in which Turner Electric notified Gilbane that it was still owed
$313,000 on the projects and that amount did not include any amount for
overtime or outside labor as those amounts were still not finalized.  This
evidence also includes the testimony of Mr. Lightman that he was aware at the
end of the projects that there were outstanding issues on the payments due
Turner Electric.

As the evidence does not conclusively establish waiver,
Gilbane was required to submit a jury question on that issue.  As it failed to
do so, Gilbane waived this affirmative defense for purposes of appeal.  XCO
Prod. Co., 194 S.W.3d at 632.  We overrule Gilbane=s first sub-issue.

2.       By
Breaching the Subcontracts, Gilbane Relinquished Its Contractual Procedural Rights
Concerning Change Orders and Claims for Additional Costs.

In this sub-issue, Gilbane argues there is insufficient
evidence to establish that Turner Electric complied with the subcontracts= conditions
precedent for submitting a claim.  Specifically, Gilbane argues there is no
evidence that Turner Electric promptly submitted a written claim for
compression costs as required by section 8.1 of the subcontracts.








Initially, Gilbane=s reliance on this
requirement of a written claim presented in a certain format is misplaced. 
When a contractor breaches a construction contract, it relinquishes its
contractual procedural rights concerning change orders and claims for
additional costs. Shintech, 688 S.W.2d at 151.  In addition, despite
Gilbane=s assertion
otherwise, there is nothing in the subcontracts mandating a particular form or
deadline for the submission of a claim.

Finally, even if Gilbane had not relinquished its
contractual procedural rights by breaching the subcontracts, there is evidence
in the record that (1) it was standard practice in the construction industry
for claims to be made at the end of projects as it is not until that point in
time that additional costs are known; (2) Turner Electric put Gilbane on verbal
and written notice throughout the projects that it would not be responsible for
additional costs caused by others involved in the projects; and (3) Turner
Electric submitted to Gilbane a written claim that included back-up
documentation for the amounts it was seeking.  In addition, Mr. Turner
testified that, in his thirty years of experience in the construction business,
the type of documentation provided to Gilbane was sufficient to constitute a
claim for delay costs.  As there is more than a scintilla of evidence
demonstrating that Turner Electric submitted a claim to Gilbane for its
compression costs, the evidence is legally sufficient.  While there was
testimony that Turner Electric did not submit a claim, it was thus the jury=s responsibility
to weigh the credibility of the witnesses and decide the weight to be assigned
to their testimony.  The jury decided this issue against Gilbane.  As the
evidence supporting the jury=s determination is not so contrary to the
overwhelming weight of evidence as to be clearly wrong and unjust, the evidence
is factually sufficient.  We overrule Gilbane=s second
sub-issue.

Having overruled both sub-issues within Gilbane=s fourth issue on
appeal, we overrule Gilbane=s fourth issue.

 








C.      Gilbane
Waived Its Argument That the Judgment Should be Modified.

In Gilbane=s sixth issue, Gilbane asserts we should
modify the amount of the judgment as it includes a double recovery because, in
Gilbane=s view, it awards
Turner Electric the value of the labor performed for change orders twice. 
However, Gilbane cites no legal authority which supports this argument.  On
appeal, an appellant=s brief must contain a clear and concise
argument for the contentions made with appropriate citations to authorities and
the record.  Tex. R. App. P. 38.1(h). 
Failure to do so results in waiver of that issue on appeal.  Accordingly,
Gilbane has waived this issue on appeal and therefore, we overrule its sixth
issue.

 D.     We Need
Not Address Gilbane=s Issues Attacking
the Jury=s Fraud Findings.

Turner Electric sued Gilbane asserting causes of action for
both breach of contract and fraud.  After the jury found in favor of Turner
Electric on both causes of action, Turner Electric elected to recover under its
breach of contract cause of action.  We have overruled all issues raised by
Gilbane addressing the breach of contract cause of action.  In its second,
third, and fifth issues, asserting various arguments, Gilbane attacks the jury=s fraud findings.
As we have overruled Gilbane=s issues attacking the judgment based on
breach of contract, we need not address the fraud issues.  Tex. R. App. P. 47.1.

Conclusion

Having overruled all of Gilbane=s issues on appeal necessary for a
final disposition of the appeal, we affirm the trial court=s final judgment.

 

 

 

/s/      John S. Anderson

Justice

 

 

Judgment rendered
and Memorandum Opinion filed February 27, 2007.

Panel consists of Justices Anderson, Hudson, and Guzman.









[1]  According to Mr. Turner, Anormal construction practices@ means the following: (1) the presence of structural
steel prior to the electricians installing electrical conduit and wiring,
creating a place for the electricians to attach the conduit and wiring; (2) the
absence of interior walls when the electricians were installing electrical
conduit and wiring allowing the electricians to use motorized scaffolding in
straight runs across the building, thus minimizing the time and number of
electricians required to perform this task; (3) logical scheduling calling for
construction from one end of the building to the other thereby minimizing
repetitive set-up and maximizing completion of an area before moving to
another; (4) proper scheduling of the work within the available eighteen months
allowing Turner Electric to (a) use its own employees as opposed to more
expensive and inefficient contract labor; and (b) not use overtime.  





[2]  The terms of the prime contract were incorporated
into the two subcontracts signed by Turner Electric. 





[3]  While only the Space Center School schedule was
entered into evidence, the testimony was that the schedules for the
construction of the two schools were similar. 





[4]  Normal construction practice is to begin erecting
the structural steel at one end of the building and then progress through the
building to the other end.  Crafts, such as the electricians and plumbers,
which use the structural steel for portions of their work, then follow along
behind the structural steel installation and, only when their work is complete,
are the interior walls built.  This procedure allows multiple crafts to work at
the same time without impeding each other=s
work as they are in different areas of the building.





[5]  In response to the compressed schedule, Gilbane made
the decision to hire two additional electrical  companies to supplement Turner
Electric=s crews.  Gilbane paid these two companies directly
and therefore had knowledge of the costs and approved the costs prior to the
performance of the work.  Turner Electric supervised the electricians provided
by these two companies.  In addition, as a result of the compression, Turner
Electric was forced to hire additional electricians through two staffing
companies.





[6]  While Gilbane argues the Total Cost Method is
universally disfavored, it cites a number of cases, many from the Federal Court
of Claims, where the method has been applied to the calculation of damages.
Under these cases, the courts applying the Total Cost Method have required four
indicia of reliability before allowing its use: (1) it is impossible or highly
impracticable to prove the contractor=s
actual losses directly; (2) the contractor=s
bid or estimate was realistic and reasonable; (3) the contractor=s actual costs were reasonable; and (4) the contractor
was not responsible for any added expenses, costs or delays.  Propollex v.
Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003); Cavalier Clothes, Inc.
v. United States, 51 Fed. Cl. 399, 418 (2001); Integrated Logistics
Support Sys. Int=l, Inc. v. United States, 47 Fed. Cl. 248, 260 (2000); United States v. R.
M. Wells Co., 497 F.Supp. 541, 545 (S.D. Ga. 1980). 





[7]  In five points within this second sub-issue Gilbane
argued Turner Electric presented insufficient evidence to prove each of the
Total Cost Method=s four required indicia of reliability. As we have
determined the damages were not calculated using the Total Cost Method, we need
not address these points. Tex. R. App.
P. 47.1. 





[8]  Mr. Turner testified that walking off the project
was not an option due to the severe consequences of such an act.  The
consequences included potentially losing all equipment on the two job sites,
non-payment of any outstanding amounts owed to Turner Electric at the time,
Gilbane could collect on Turner Electric=s
bond which was backed by Mr. Turner=s
personal assets, or Gilbane could hire replacement companies and Turner
Electric would be responsible for any amount paid to them over the subcontract
amounts, and finally, the impact on Turner Electric=s reputation would have been devastating.





[9]  Mr. Niccum testified that it is common in the construction industry for
claims by subcontractors for additional money under the subcontracts to not
come in until the very end of the work. According to Mr. Niccum it occurs at
the end as it is not until that point, after the work is mostly complete, that
a subcontractor knows what costs above the subcontract amounts it has incurred.
Mr. Niccum also testified that even though there might be outstanding payment
issues, it is standard practice in the construction industry for subcontractors
to submit the type of release at issue here in the expectation that all open
payment issues would be resolved and a final payment would be forthcoming. Mr.
Niccum continued that this practice is almost mandated by the fact that most
owners, such as CCISD, require these releases before they will make final
payments to the general contractor.